JOHN REINSTEIN vs. POLICE COMMISSIONER OF BOSTON &
another;[1] BOSTON POLICE PATROLMEN'S ASSOCIATION,
INCORPORATED, intervener.

Suffolk. April 3, 1979. — June 19, 1979.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, LIACOS, & ABRAMS, JJ.

*Public Record. Police. Municipal Corporations*, Public records.
*Criminal Offender Record Information. Privacy.*

The exemption from public disclosure of "investigatory materials"
compiled by law enforcement officials, as required by G. L. c. 4, § 7,
Twenty-sixth (*f*), did not operate as a blanket exemption from dis-
closure of all information contained in records of the Boston police
department relating to the discharge of firearms by Boston police
officers. [289-292]

The exemption from public disclosure of materials relating to a
specifically named individual, the disclosure of which may consti-
tute an invasion of personal privacy, as required by G. L. c. 4, § 7,
Twenty-sixth (*c*), did not operate as a blanket exemption from dis-
closure of all information contained in records of the Boston police
department relating to the discharge of firearms by Boston police
officers. [292-293]

The exemption from public disclosure of criminal offender record in-
formation under G. L. c. 6, § 172, did not operate under c. 4, § 7,
Twenty-sixth, as a blanket exemption from disclosure of all infor-
mation contained in records of the Boston police department relat-
ing to the discharge of firearms by Boston police officers. [293-294]

Discussion of procedure to be followed by a judge in determining
whether and to what extent public records may be exempted from
disclosure when claims of exemption by an agency appear not oth-
erwise capable of fair analysis. [294-296]

CIVIL ACTION commenced in the Superior Court on May
2, 1977.

[1] The police department of Boston.

The case was heard by *Young, J.,* on motions for summary judgment.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John Reinstein,* pro se.

*Nicholas Foundas* for the defendants.

*William B. Vernon* for the intervener.

KAPLAN, J. In this action, under statute, the plaintiff Mr. John Reinstein sought to compel the defendants Boston police department and the police commissioner of Boston to provide him with access to certain departmental records. A judge of the Superior Court, upon cross-motions for summary judgment, denied all relief and directed entry of judgment for the defendants. From that judgment the plaintiff appealed, and we brought the case here on our own motion. As we believe the plaintiff may be entitled to access to some parts of the records he requested, we shall reverse the judgment for further proceedings below. We begin by indicating how the records in question were created and of what, in general, they consist.

The records have to do with the discharge of weapons by police officers otherwise than under training or practice conditions. The department's rule 35, which governed from 1950 to 1974, justified discharge of a revolver by an officer in order to defend himself or others from death or serious injury, or to arrest or prevent the escape of a person who had committed a felony in the officer's presence, or to bring about certain other results; but the rule prohibited use of the weapon to aid in the arrest or stop the flight of one who had merely committed a misdemeanor. An officer who discharged a weapon "except when practicing with it" was required to inform his commanding officer, who in turn was to submit a written report of the incident to the superintendent, including an account of the circumstances, the injury if any inflicted, the care given to the injured, and the names of the officer and others involved.

Stricter standards for the use of deadly force under "street conditions,"[2] together with more elaborate requirements for the reporting and investigation of incidents, came in with rule 303, adopted by the department in 1974.[3] We provide a brief summary. An officer may discharge a firearm "[t]o defend himself or another [person] from an unlawful attack which he has reasonable cause to believe could result in death or great bodily injury"; also "[t]o apprehend a fleeing felon when the officer knows, as a virtual certainty,. . . that the subject has committed a felony during the commission of which he inflicted or threatened to inflict deadly force upon the victim, and . . . that there is substantial risk that the felon in question will cause death or great bodily injury if his apprehension is delayed." Use of warning shots is restricted as is firing at moving vehicles.

To monitor compliance with standards, and to subject standards to intelligent criticism with a view to their possible amendment,[4] rule 303 requires various reports and investigations of shooting incidents. The officer sub-

---

[2] Defined as "all those in which an officer is rendering police services, as opposed to attending a training course, maintaining equipment, or engaging in purely administrative functions which do not bring him into public contact."

[3] The Boston police department is one of a number around the country that have adopted restrictions on the use of deadly force similar to those set forth in the Model Penal Code §§ 3.04-3.11 (Proposed Official Draft 1962). See Comment, Deadly Force to Arrest: Triggering Constitutional Review, 11 Harv. C.R.-C.L.L. Rev. 361, 370 n.42 (1976). In recent years there has been extensive commentary on the subject. See id.; Note, Justification: The Impact of the Model Penal Code on Statutory Reform, 75 Colum. L. Rev. 914 (1975); Note, Justifiable Use of Deadly Force by the Police: A Statutory Survey, 12 Wm. & Mary L. Rev. 67 (1970); Note, Justification for the Use of Force in the Criminal Law, 13 Stan. L. Rev. 566 (1961).

[4] According to the commissioner's affidavit, some members of the command staff thought the restrictions of rule 303 were excessive, and a "firearms discharge review board" (mentioned below) was established as part of the rule so that amendments could be generated if necessary.

mits a detailed "incident report,"[5] whereupon his commanding officer initiates an investigation of the event conducted, usually, by the officer's immediate supervisor. This eventuates in a report of findings to the commanding officer, who presents this report with his own recommendations to the police commissioner. All this must occur within twenty-four hours of the incident. In case a person has been wounded or killed, there is a supplemental investigation and report by the internal affairs division of the department. Final review is carried out by a "firearms discharge review board" of seven members: all are departmental officials or police officers of whom two officers are designated by the officer concerned in the incident. On the basis of the several reports and its independent investigation, the board makes findings regarding compliance with regulations by all concerned, and presents ultimate recommendations. Receiving this report, the commissioner may return it for any further consideration or report. He retains authority for final departmental disposition of the case. All the reports mentioned are lodged with the commissioner, the divisions of internal affairs and personnel, the ballistician, and the chairman of the review board (who is the superintendent-in-chief).

To return to the immediate facts: The plaintiff, an attorney serving the Massachusetts Civil Liberties Union, on February 1, 1977, wrote to the custodian of records of the Boston police department requesting permission to inspect and copy the records (meaning essentially the reports) relating to the discharge of firearms by Boston police officers during the period 1972 to 1976.[6] He cited

---

[5] Among other things, the report is to state why the officer used the weapon, how many rounds he fired, whether he was on or off duty, and, where he fired at another person, the distance to that person, the number of rounds fired by the latter, and who fired first.

[6] The plaintiff did not seek the reports made by the internal affairs division or any reports relating to pending investigations or prosecutions.

G. L. c. 66, § 10 (a), which refers to "any public record," as defined compendiously, with stated exceptions, in G. L. c. 4, § 7, Twenty-sixth.[7] Promptly the custodian denied the request, claiming exemption under four clauses of the latter text. The plaintiff then asked the Supervisor of Public Records to intercede (see G. L. c. 66, § 10 [b], as appearing in St. 1976, c. 438, § 2),[8] but, after in camera inspection by members of his staff, the Supervisor replied by letter that the records were exempt from disclosure because they contained criminal offender record information (CORI) as defined in G. L. c. 6, § 167 (and see § 172), and so were "specifically . . . exempted from disclosure by

[7] General Laws c. 66, § 10 (a), as appearing in St. 1978, c. 294, provides, "Every person having custody of any public record, as defined in clause Twenty-sixth of section seven of chapter four, shall, at reasonable times and without unreasonable delay, permit it, or any segregable portion of a record which is an independent public record, to be inspected and examined by any person, under his supervision, and shall furnish one copy thereof upon payment of a reasonable fee. Every person for whom a search of public records is made shall, at the direction of the person having custody of such records, pay the actual expense of such search."

General Laws c. 4, § 7, Twenty-sixth, as appearing in St. 1973, c. 1050, § 1, contains the general definition: " 'Public records' shall mean all books, papers, maps, photographs, recorded tapes, financial statements, statistical tabulations, or other documentary materials or data, regardless of physical form or characteristics, made or received by any officer or employee of any agency, executive office, department, board, commission, bureau, division or authority of the commonwealth, or of any political subdivision thereof, or of any authority established by the general court to serve a public purpose . . . ."

Several exceptions follow. We quote certain of them, as relevant, below.

[8] Section 10 (b) states in pertinent part: "If the custodian refuses or fails to comply with such a request, the person making the request may petition the supervisor of records for a determination whether the record requested is public. Upon the determination by the supervisor of records that the record is public, he shall order the custodian of the public record to comply with the person's request. If the custodian refuses or fails to comply with any such order, the supervisor of records may notify the attorney general or the appropriate district attorney thereof who may take whatever measures he deems necessary to insure compliance with the provisions of this section."

statute" (G. L. c. 4, § 7, Twenty-sixth [a]), and were further exempt because they contained "investigatory materials" (*id.*, [f]). The Supervisor said, however, that access to a specific report might be proper if any CORI was deleted and it appeared that disclosure would not impede effective law enforcement.

In May, 1977, the plaintiff commenced the present action pursuant to G. L. c. 66, § 10 (b),[9] to secure access to the 1972-1976 records. The defendants answered claiming sundry exemptions, and the Boston Police Patrolmen's Association, Incorporated, intervened on the defendants' side. In due course the plaintiff served interrogatories under Mass. R. Civ. P. 33, as amended, 368 Mass. 905 (1975), intended to elicit information about the structure and contents of the firearms reports. The defendants tendered some information,[10] but they objected to most of the interrogatories, primarily on the ground that they called for information whose exempt character was at issue in the case. At this point the plaintiff moved to compel answers to the unanswered interrogatories and, alternatively, to require the defendants to itemize and index the records and give detailed justification for the asserted exemptions.[11] The plaintiff moved also for summary judgment on the theory that, with records presumptively public and subject to disclosure (see G. L. c. 66, § 10 [c]), no adequate defense had been raised to the claim for access. Cross-moving for summary judgment, the defendants annexed an affidavit of the commissioner in which he asserted that the records contained CORI,

---

[9] "If a custodian of a public record refuses or fails to comply with the request of any person for inspection or copy of a public record or with an administrative order under this section, the supreme judicial or superior court shall have jurisdiction to order compliance."

[10] As indicated below, the defendants set out the names of persons killed or injured in the incidents.

[11] The latter motion was styled on that discussed in *Vaughn* v. *Rosen*, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974), cited below.

and that disclosure would discourage witnesses from coming forward during investigations and would inhibit frank discussion by investigating officers. Attached was the letter of the Supervisor of Public Records.[12] The plaintiff responded by an affidavit invoking Mass. R.Civ.P. 56 (f), 365 Mass. 824 (1974) ("When Affidavits are Unavailable"), and stating that he was not able to meet the commissioner's representations because the relevant material was under the defendants' exclusive control.

As noted, the judge granted summary judgment for the defendants. He said it was undisputed that the records contained CORI (the subdivision [a] exemption). Further, the commissioner's "uncontroverted affidavit" indicated that the records constituted investigatory materials which might lead to intradepartmental discipline (subdivision [f]). Doubts on that score, according to the judge, were removed by the Supervisor's letter which was entitled to "great weight."[13] The judge said that his award of summary judgment "mooted" the plaintiff's motions to compel answers to interrogatories and for indexing and so he did not consider them further.

The judge's memorandum with order for judgment was dated June 30, 1978; judgment entered on July 3, 1978. It is perhaps of interest that there was no mention of the approval on June 27, 1978, of an amendment of § 10 (a) making clear what may not have been entirely evident before,[14] namely, that the right to access extended to any

---

[12] The letter had previously been annexed to the defendants' answer and was ordered struck therefrom on the plaintiff's motion.

[13] Because the case calls plainly for remand to consider segregation of nonexempt material, we need not dwell at length on the precise weight to be given the Supervisor's view. But we note that "the administrative remedy [of application to the Supervisor] provided by this section [does not] in any way limit the availability of judicial remedies" (§ 10 [b]), that the Supervisor's staff acted in camera, and that no review of the Supervisor's opinion was available to the plaintiff.

[14] Federal and State cases, however, had ordered disclosure of segre-

nonexempt "segregable portion" of a public record. St. 1978, c. 294.[15] The amendment parallels a 1974 amendment of the Federal Freedom of Information Act.[16] It is applicable to the present dispute. See *Lee Pharmaceuticals* v. *Kreps*, 577 F.2d 610, 614 (9th Cir. 1978), and cases cited.

We cannot answer here and now whether there are nonexempt segregable portions of the firearms records, or, if so, what these portions are. But the questions arise quite naturally and should be pursued on remand. The defendants themselves in answer to interrogatories disclosed not only the number of persons injured or killed in the relevant incidents, but also their names. One can surmise by reference to rules 35 and 303 that the firearms records probably contain other information whose disclosure would be of considerable public interest and would offend no legitimate interest on the part of the government or private citizens. By way of illustration — and again we speculate, we do not decide — consider so much of the records as would disclose, for each of the years, the number, times, and places of incidents; number of incidents in which police fired first, or fired only after weapons had been fired by others; number of incidents in which violations were found at the several levels of investigation; classifications of violations and number per class; number of recommendations of disciplinary action

gable nonexempt portions of public records even in the absence of specific statutes authorizing segregation. See *Vaughn* v. *Rosen*, 484 F.2d 820, 825 (D.C. Cir. 1973); *Soucie* v. *David*, 448 F.2d 1067, 1079 (D.C. Cir. 1971); *Bristol-Myers Co.* v. *FTC*, 424 F.2d 935, 938-939 (D.C. Cir. 1970); *Montes* v. *State*, 94 Misc. 2d 972 (N.Y. Ct. Cl. 1978).

[15] The 1978 amendment requires disclosure of "any segregable portion of a record which is an independent public record," that is, any portion that falls within the statutory definition of "public record" after exempt portions have been deleted.

[16] See 5 U.S.C. § 552(b)(7) (Supp. IV 1974): "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection."

at the several levels; number of officers in fact disciplined; substance of any recommendations for changes in the rules. (Such data would permit comparisons as between the periods before and after adoption of rule 303.)

It remains, first, to point out more specifically that none of the claimed exemptions from disclosure stands as a blanket exemption for the firearms records, especially when the statutory amendment is taken into account, and, second, to indicate how the parties and the judge are to proceed on remand.

1. *Exemptions.* (a) *Investigatory materials.*[17] In *Bougas* v. *Chief of Police of Lexington,* 371 Mass. 59 (1976), the plaintiffs sought access to reports of the Lexington police and letters to the police from private citizens regarding an incident that resulted in misdemeanor charges against several of the plaintiffs. Holding against access (and this notwithstanding the fact that the investigation had been concluded), we said the exemption for investigatory materials aimed at "the avoidance of premature disclosure of the Commonwealth's case prior to trial, the prevention of the disclosure of confidential investigative techniques, procedures, or sources of information, the encouragement of individual citizens to come forward and speak freely with police concerning matters under investigation, and the creation of initiative that police officers might be completely candid in recording their observations, hypotheses and interim conclusions." *Id.* at 62. The present defendants urge that any disclosure here would defeat the aims mentioned, but it is noteworthy that we said in *Bougas,* "There is no blanket exemption provided for records kept by police departments." *Id.* at 65. Nor does the statute exempt all investigatory materials; in-

---

[17] Subdivision (*f*) of G. L. c. 4, § 7, Twenty-sixth, as appearing in St. 1973, c. 1050, § 1, exempts "investigatory materials necessarily compiled out of the public view by law enforcement or other investigatory officials the disclosure of which materials would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest . . . ."

stead it invites case-by-case consideration of whether access "would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest ...."[18] That some exempt material may be found in a document or report of an investigatory character does not justify cloture as to all of it. See *Walker* v. *City of New York*, 64 App. Div. 2d 980 (N.Y. Ct. Cl. 1978); *Montes* v. *State*, 94 Misc. 2d 972 (N.Y. Ct. Cl. 1978).

We conceive that protection might with reason be claimed by the department against giving up the identity of confidential sources or revealing secret investigative procedures touching on firearms cases under the departmental rules. But prima facie there is no ground for uneasiness about letting the plaintiff have the times and places of incidents or the like or aggregated facts resembling those referred to above by way of illustration.[19]

Information in the firearms records that might bear on possible discipline of police officers or putative criminal prosecution of individuals could possibly invite comparison with the information ruled sensitive in the *Bougas* case, but there is value in observing a distinction drawn

[18] However, we recognize that in given circumstances certain categories of records, such as witness statements to be used in a pending criminal proceeding, may be exempt from disclosure without an inquiry into whether disclosure would cause undue prejudice to effective law enforcement, in the particular case. See *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U.S. 214 (1978) (allowing "generic" determination that disclosure of statements of witnesses to be used in pending unfair labor practice proceeding would interfere with enforcement proceeding).

[19] For cases in varying settings authorizing disclosure of all or portions of police reports dealing with the legality of police conduct, often against a contention that those reports were exempt as "investigatory," see *Houston* v. *Rutledge*, 237 Ga. 764 (1976) (files concerning deaths of prison inmates); *Montes* v. *State*, 94 Misc. 2d 972 (N.Y. Ct. Cl. 1978) (personnel records, including citizen complaints, concerning particular officer); *Walker* v. *City of New York*, 64 App. Div. 2d 980 (N.Y. 1978) (complaints and investigations concerning shooting by particular officer); *Farrell* v. *Village Bd. of Trustees of Johnson City*, 83 Misc. 2d 125 (N.Y. Sup. Ct. 1975) (written reprimands for on-duty misconduct).

by the courts in construing the analogous "investigatory" exemption of the Federal act.[20] The distinction is between "government surveillance or oversight of the performance of duties of its employees" and "investigations which focus directly on specifically alleged illegal acts, illegal acts of particular identified officials, acts which could, if proved, result in civil or criminal sanctions." *Rural Hous. Alliance* v. *United States Dep't of Agriculture*, 498 F.2d 73, 81 (D.C. Cir. 1974). Although "[t]here is no clear distinction between investigative reports and material that, despite occasionally alerting the administrator to violations of the law, is acquired essentially as a matter of routine," *id.* at n.47, quoting from *Center for Nat'l Policy Review* v. *Weinberger*, 502 F.2d 370, 373 (D.C. Cir. 1974), still the distinction is taken lest the exemption "swallow[ ] up the Act." *Id.* "[M]ost information sought by the Government about its own operations is for the purpose

_____

[20] That exemption, as originally written, covered "investigatory files compiled for law enforcement purposes except to the extent available by law to a private party." Pub. L. No. 89-487, § 3(e), 80 Stat. 251 (1966). Because of a belief that the exemption had been read too broadly, Congress amended it in 1974 to cover "investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation . . . confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel." 5 U.S.C. § 552(b)(7) (Supp. IV 1974). Thus the exemption has been better adapted to its perceived purposes, *NLRB* v. *Robbins Tire & Rubber Co.*, 437 U.S. 214, 221-236 (1978). As amended, it has been used as a guide to the interpretation of a State statute. *Jensen* v. *Schiffman*, 24 Or. App. 11, 14-16 (1976).

The distinction described in our text has been applied in cases decided under the earlier as well as the later versions of the investigatory exemption. See *Sears, Roebuck & Co.* v. *General Servs. Administration*, 509 F.2d 527 (D.C. Cir. 1974); *Center for Nat'l Policy Review* v. *Weinberger*, 502 F.2d 370 (D.C. Cir. 1974); *Metropolitan Life Ins. Co.* v. *Usery*, 426 F. Supp. 150 (D.D.C. 1976).

ultimately of determining whether such operations comport with applicable law. . . . Any internal auditing or monitoring conceivably could result in disciplinary action, in dismissal, or indeed in criminal charges against employees. But if this broad interpretation is correct, . . . exemption 7 [investigatory materials] defeats one central purpose of the Act to provide public access to information concerning the Government's own activities." *Id.*

(b) *Privacy.* Although the privacy issue was not mentioned by the judge below, the defendants and intervener invoke that part of subdivision (c) which exempts "materials or data relating to a specifically named individual, the disclosure of which may constitute an invasion of personal privacy." A police officer would be obliged to make an incident report or to respond to questions in the course of a firearms investigation, on pain otherwise of losing his job; but he could not be prosecuted criminally on the basis of the information he supplied. *Garrity* v. *New Jersey,* 385 U.S. 493 (1967). *Gardner* v. *Broderick,* 392 U.S. 273, 278 (1968). *Broderick* v. *Police Comm'r of Boston,* 368 Mass. 33, 38 & n.3 (1975). *Silverio* v. *Municipal Court of the City of Boston,* 355 Mass. 623, 628-630 (1969). In these circumstances the public disclosure of the officer's avowals would not violate his Fifth Amendment rights. Cf. *Lefkowitz* v. *Cunningham,* 431 U.S. 801, 805-806 (1977). Yet if members of the public were allowed access to the material elicited from the officer he might suffer an intrusion on his privacy with possible collateral injuries such as loss of opportunities for future employment. Against the prospective invasion of individual privacy is to be weighed in each case the public interest in disclosure: the tilt of the scale will suggest whether the subdivision (c) exemption should be allowed. See *Attorney Gen.* v. *Collector of Lynn,* 377 Mass. 151, 156 (1979); *Hastings & Sons Publishing Co.* v. *City Treasurer of Lynn,* 374 Mass. 812, 818 (1978); *Getman* v. *NLRB,* 450 F.2d 670, 674 (D.C. Cir. 1971). Cf. *Attorney Gen.* v. *School Comm. of Northampton,* 375 Mass. 127, 132 & n.5 (1978).

Materials not unfavorable to the officer would naturally make a weaker claim for exemption than those that picture him in a more garish color. There is surely room for argument in the present context that the public interest does not demand connecting officers by name to particular incidents, and there are Federal cases which have, in analogous settings of work evaluations, approved the deletion of particular identifying details from a document which is otherwise ordered disclosed. See *Associated Dry Goods Corp.* v. *NLRB,* 455 F. Supp. 802, 815 (S.D.N.Y. 1978); *Nationwide Mut. Ins. Co.* v. *Friedman,* 451 F. Supp. 736, 745 (D. Md. 1978); *Metropolitan Life Ins. Co.* v. *Usery,* 426 F. Supp. 150, 168-169 (D.D.C. 1976); *Vaughn* v. *Rosen,* 383 F. Supp. 1049, 1054-1055 (D.D.C. 1974), aff'd 523 F.2d 1136 (D.C. Cir. 1975). Cf. *Department of Air Force* v. *Rose,* 425 U.S. 352, 376-377 (1976). In all events, like those Federal courts, we reject the suggestion that any record as to which the privacy exemption may have some application is necessarily to be withheld in its entirety.

(c) *CORI.*[21] This information, defined in G. L. c. 6, § 167, as amended by St. 1977, c. 691, § 2, comprises "records and data in any communicable form compiled by a criminal justice agency which concern an identifiable individual and relate to the nature or disposition of a criminal charge, an arrest, a pre-trial proceeding, or other judicial proceedings, sentencing, incarceration, rehabilitation, or release." Section 167 goes on to say, "Such information shall be restricted to that recorded as the result of the initiation of criminal proceedings or any consequent proceedings related thereto"; further, the information "shall not include evaluative information, statistical and analytical reports and files in which individuals are not directly or indirectly identifiable, or intelligence information." CORI may not be disclosed to members of the

---

[21] Subdivision (a) of G. L. c. 4, § 7, Twenty-sixth, as appearing in St. 1973, c. 1050, § 1 exempts materials "specifically or by necessary implication exempted from disclosure by statute . . . ."

general public (see § 172; *New Bedford Standard-Times Publishing Co.* v. *Clerk of the Third Dist. Court of Bristol,* 377 Mass. 404 [1979]), although it is available to criminal justice agencies and some others as prescribed in the statute.

We may assume, with the judge below, that the firearms reports may contain CORI, for example, mention of arrests. It is indeed open to argument that the information appearing in the reports would not have been recorded in connection with the initiation or progress of criminal proceedings, and thus would be outside CORI as defined; but that may be too fine a point, especially with regard to rule 303 incident reports, for these, we are told, sometimes do double duty by being turned in also as regular police reports. But, granted that true CORI or information plausibly within that nondisclosure policy may appear in the firearms material sought by the present plaintiff, deletion or separation of the offending material seems quite possible. The defendants do not dispute this point.

2. *Steps on remand.* The plaintiff's interrogatories and his motions to compel answers and for itemization, indexing, and detailed justification were all an attempt to surmount an obvious difficulty in the enforcement of the duty to provide access to public records. In general, disclosure is favored—the statute creates "a presumption that the record sought is public," and the burden is "upon the custodian to prove with specificity the exemption which applies." See G. L. c. 66, § 10(c); *Attorney Gen.* v. *School Comm. of Northampton, supra* at 132; *Hastings & Sons Publishing Co.* v. *City Treasurer of Lynn, supra* at 816. Yet a plaintiff usually starts with a handicap of ignorance as to what exactly the records contain, while the custodian agency has the not inconsiderable advantage of full knowledge, which lends some appearance of authority to its protestation that any attempt at analysis would prejudice decision because it would itself amount to disclosure. "This lack of knowledge by the party see[k]ing

disclosure seriously distorts the traditional nature of our legal system's form of dispute resolution." *Vaughn* v. *Rosen*, 484 F.2d 820, 824 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974). In camera inspection and decision by the judge is a solution, but an unhappy one, to be used only in the last resort, precisely because it forfeits bilaterality. See *Bougas* v. *Chief of Police of Lexington*, *supra* at 64-65.

Federal courts, following the lead of the *Vaughn* case, have evolved a working procedure short of the in camera device. When claims of exemption by an agency appear not otherwise capable of fair analysis, the agency is required, on motion, to itemize and index the records requested and give detailed justifications for its claims. "In a large document it is vital that the agency specify in detail which portions of the document are disclosable and which are allegedly exempt. This could be achieved by formulating a system of itemizing and indexing that would correlate statements made in the Government's refusal justification with the actual portions of the document. Such an indexing system would subdivide the document under consideration into manageable parts cross-referenced to the relevant portion of the Government's justifications. Opposing counsel should consult with a view toward eliminating from consideration those portions that are not controverted and narrowing the scope of the court's inquiry." *Vaughn*, *supra* at 827. The procedure plays in with the "segregable" rule, as established by Federal statute and now by our own. Of the many cases in which the technique has been applied, we cite in the margin a few that will perhaps be found most instructive.[22]

_____

[22] See *Ray* v. *Turner*, 587 F.2d 1187, 1195-1199 (D.C. Cir. 1978) (reprinting inadequate justifications at 1198-1199); *Baker* v. *CIA*, 580 F.2d 664 (D.C. Cir. 1978); *Ash Grove Cement Co.* v. *FTC*, 511 F.2d 815 (D.C. Cir. 1975); *Serbian E. Orthodox Diocese* v. *CIA*, 458 F. Supp. 798 (D.D.C. 1978); *Flower* v. *FBI*, 448 F. Supp. 567 (W.D. Tex. 1978); *Cerveny* v. *CIA*, 445 F. Supp. 772 (D. Colo. 1978); *Mobil Oil Corp.* v. *FTC.*, 406 F. Supp. 305 (S.D.N.Y. 1976).

On remand, the judge, in dealing with the plaintiff's undecided motions, should take such benefit from the Federal method as he may think advisable. Plainly there is room for improvisation. While the defendants may be obliged to furnish specific reasons for withholding information, the entire process, we think, could be facilitated in a case like the present by the plaintiff's being reasonably forthcoming about what in fact he is interested to find out. The Federal experience tends to show that with willing cooperation much can be settled by agreement of the parties.

The judgment will be vacated and the case remanded for further proceedings consistent with this opinion.

*So ordered.*