SUPERIOR COURT 
 
 DANIEL L. GOLDEN v. MIDDLESEX COUNTY DISTRICT ATTORNEY'S OFFICE

 
 Docket:
 2484CV01541-C
 
 
 Dates:
 February 19, 2025
 
 
 Present:
 Robert B. Gordon
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO RECONSIDER ORDER OF JANUARY 30, 2025
 
 

             The Court has reviewed the Defendant's Motion to Reconsider, which is addressed to the Court's January 30, 2025 Memorandum of Decision and Order on Plaintiffs Motion to Compel Production of Withheld Records (related to the investigation of the notorious Mary Joe Frug homicide). For the reasons which follow, the Defendant's motion shall be DENIED.
            The undersigned remains highly doubtful that the Plaintiffs Public Records Law (PRL) request, which seeks police documents related to a homicide that took place nearly 35 years ago, threatens the integrity or effectiveness of an open criminal investigation. The Court's Order for the production of a document index has taken great pains to ensure preservation of the confidentiality of information whose disclosure might compromise any legitimate interest of law enforcement, as contemplated by the investigative exemption of the PRL. See G.L. c. 4, § 7, 26(f). Thus:
            •           The Defendant has been called upon to produce only an index of responsive
 
                                                            -1-
 
documents, rather than the documents themselves.
•           The documents to be indexed are temporally limited to the time frame between April, 1991 and December, 1994, a period more than 30 years ago.
•           The required description of the indexed records' subject matter specifically allows the Defendant to redact (through coding or striking) any and all personal identifiers and other material facts the disclosure of which would likely compromise the integrity of the subject homicide investigation.
•           It is true that the required index calls upon the Defendant to identify a referenced document by date, author and recipient (unless the particular disclosure of same would reveal material information about the substance of the ongoing investigation, such as where the author or recipient of a communication is/was a witness, suspect or person of interest); but such information, particularly when purged of information that would identify suspects, witnesses and sources, cannot reasonably be thought to jeopardize any current investigation into the case.
            The Defendant has evidently created a document index that summarizes all of the documents in the Middlesex County District Attorney's Office's (MDAO's) investigation file of the Frug murder, an index it describes in two affidavits yet to be filed by Assistant District Attorney David Solet. This index, however, is not the index the Court has ordered the Defendant to produce. The index the Defendant describes, if produced to the Plaintiff, may well provide would-be "sleuths" with a roadmap of the District Attorney's entire investigation, including the names of witnesses and sources of information, the identity of suspects and persons of interest, details of investigative steps that have been and may yet be taken, factual summaries of witness interviews that reveal evidence known and - by negative implication - unknown, and the like. But none of this kind of information will be divulged in the much more narrowly tailored document index the Court has ordered. The Defendant's apparent blindness to this fact appears willful.
            "Two statutes govern public records requests: G.L. c. 66, § I 0(a), which requires agencies, like the district attorney's office, to provide access to public records on request; and
 
                                                            -2-
 
G.L. c. 4, § 7, [¶ 26], which defines the scope of public records." Mack v. District Att'y for Bristol Dist., 494 Mass. 1, 9 (2024), citing Rahim v. District Att'y for the Suffolk Dist., 486 Mass. 544, 547 (2020). "The primary purpose of these statutes is to provide the public 'broad access to government records' and information [bearing] on 'whether public servants are carrying out their duties in an efficient and law-abiding manner."' Mack, 494 Mass. at 9, citing Attorney General v. District Att'y for Plymouth Dist., 484 Mass. 260, 262-63 (2020). "Because the statute presumes disclosure," exemptions "must be strictly and narrowly construed." Rahim, 486 Mass. at 549 (citations and internal quotations omitted).
            The investigatory exemption, G.L. c. 4, § 7, ¶ 26(f), is "aimed at the avoidance of premature disclosure of the Commonwealth's case prior to trial, ... the disclosure of confidential investigative techniques, procedures, or sources of information, the encouragement of individual citizens to come forward and speak freely with police ... , and the creation of initiative that police officers might be completely candid in recording their observations, hypotheses and interim conclusions." Mack, 494 Mass. at 13, quoting Reinstein v. Police Comm'r of Boston, 378 Mass. 281,289 (1979). As the SJC has stressed time and again, paragraph 26(f) is not "a blanket exemption for investigatory materials assembled by police departments." Rahim, 486 Mass. at 552, quoting WBZ-TV4 v. District Att'y for the Suffolk Dist., 408 Mass. 595,603 (1990).[1] The record custodian must, rather, demonstrate that production of the requested materials "would probably so prejudice the possibility of effective law enforcement that such disclosure would not be in the public interest." Rahim, 486 Mass. at 551, quoting G.L. c. 4, § 7, ,r 26(f). In this connection, the Court must evaluate such a claim on "a careful case-by-case" and,
 
--------------------------------------------
 
[1] Accord Mack, 494 Mass. at 13 ("This is not a blanket exemption that applies to any record kept by a police department for an investigation."); Worcester Telegram & Gazette Corp. v. Chief of Police of Worcester, 436 Mass. 378, 383 (2002) ("There is no 'blanket exemption' to public disclosure ... for investigatory materials."); Bougas v. Chief of Police of Lexington, 371 Mass. 59, 65 (1976) ("no blanket exemption").
 
                                                            -3-
 
indeed, document-by-document basis. Rahim, 486 Mass. at 549, 552 ("The burden is on the district attorney 'to prove, by a preponderance of the evidence, that such record or portion of the record may be withheld ... before a court may conclude that exemption (f) applies." [emphasis supplied]), quoting G. L. c. 66, § 10A(d)(l)(iv).[2] An agency may thus not invoke an "on-going homicide investigation" as some sort of talisman to withhold investigative materials from otherwise required public disclosure. See Rahim, 486 Mass. at 552 (even "materials concerning an investigation into an individual's ties to an international terrorist organization known for targeting law enforcement officials" held not entitled to categorical exemption); Bougas v. Chief
of Police of Lexington, 371 Mass. 59, 65 (1976) ("[I]nvestigatory materials exemption [does not] extend to every document that may be placed within ... an investigatory file."); Roman Cath. Bishop of Springfield v. Travelers Cas. & Sur. Co., No. 05-0602, 2008 WL 650409, at *3 (Mass. Super. Ct. Jan. 7, 2008) (Agostini, J.) ("bare claim that giving [witness statements to] the defendants [ ] would prejudice an ongoing, open murder investigation" held not sufficient to justify withholding per exemption).[3]
 
--------------------------------------------
 
[2] See Worcester Tel., 436 Mass. at 383, 386 ("To the extent that only a portion of a public record may fall within an exemption to disclosure, the nonexempt 'segregable portion' of the record is subject to public access."; "What is critical is the nature or character of the documents, not their label."); Reinstein. 378 Mass. at 290 ("That some exempt material may be found in a document or report of an investigatory character does not justify cloture as to all of it.").
[3] The Court acknowledges that the simple status of an investigation (open or closed) will not necessarily be determinative of the exemption's applicability, one way or the other. Common sense naturally suggests that the interests militating against disclosure may be particularly acute where the subject criminal activity or the investigation thereof is recent or ongoing. That said, however, the purposes of the exemption may or may not be served by preventing public access to investigatory materials long after the crime occurred, particularly where the crime remains unsolved. Compare Globe Newspaper Co. v. Police Comrn'r of Boston, 419 Mass. 852, 862-63 (1995), quoting Bougas, 371 Mass. at 63 ("Even materials relating to an inactive investigation may require confidentiality in order to convince citizens that they may safely confide in law enforcement officials.") with Roman Cath. Bishop of Springfield, 2008 WL 650409, at *4 (no reason to conclude that disclosure of statements 35 years after murder would discourage other witnesses from coming forward, where renewed public attention already caused some witnesses to realize significance of what they had seen and others to overcome fears that contributed to their initial silence; "disclosure of their statements would likely give others with relevant information ... the courage and support to come forward"). The critical take-away is that if the Legislature intended to create a categorical exemption for on-going investigations, homicide cases, or otherwise, it could have done so. It clearly did not, and
 
                                                            -4-
 
            In the face of these authorities, however, the Defendant continues to press for what amounts to a categorical exemption for open police investigations, relying on arguments largely untethered to the purposes of paragraph 26(f) or the underlying Frug homicide. The Court has reviewed the Defendant's articulation of the myriad ways that a member of the public might draw inferences about the substance of ongoing (rather than historical) aspects of the Frug investigation, based on nothing more than the anonymized and generic information contained in the index it has ordered, and remains entirely unconvinced. The hypotheses the MDAO has conjured are so completely conjectural as to border on abject invention. First, they are presented at such abstract and theoretical levels that most (if not all) could apply to any criminal investigation. Relatedly, many are not even conceivably implicated by the simple index that the Court has ordered here which, as Defendant's motion assiduously ignores, is limited to documentary materials more than three decades old.[4]
 
--------------------------------------------
 
for sound reasons of policy. See Rahim, 486 Mass. at 552; Roman Cath. Bishop of Springfield, 2008 WL 650409, at *3.
[4] For example, the MDAO argues that, based on the disclosure of a document's author, "suspects [may] recognize that a specific unit-such as homicide, cybercrime,  or organized task forces-is involved  ...  [and] adjust their tactics accordingly           "(Def.'s Mot. at p. 7). The fact that the homicide unit is investigating a homicide, however, is hardly revelatory. Likewise, the notion that the cybercrime, organized crime, or similar  specialized  unit was involved in the early 1990s investigation of the Frug homicide, and that the disclosure of same could produce some change in tactics by suspects who wish to continue evading  authorities  more  than thirty years  later,  appears  more than a little farfetched. The Defendant raises several variations of a similar  argument,  to  the effect  that  if investigators are identified as document authors/recipients, suspects "may infer that law enforcement considers the case a priority" and "alter their behavior, destroy evidence, or go into hiding" or, alternatively, if an investigator or unit "has a known workload of multiple cases" or "a history of slow case resolution," "suspects might assume that they are not the primary focus and continue their activities" or "have more time . . . to relocate or fabricate alibis." (Def.'s Mot. at pp. 7-8). Please. Setting aside the dubious notion that a criminal suspect would have knowledge of the case-flow within department units or that "an officer . . . has a known history of working undercover" (Def.'s Mot. at p. 7), it seems fanciful to suggest that identifying an investigator from 1991-1994 will somehow convey a message about the priority of the investigation, and either spur or deter some action in a suspect in 2025, that has not already been conveyed in the intervening 30-plus years or the MDAO's own public identification of the Frug homicide as a priority of its Cold Case Unit. See Dwyer, Dialynn. "A unit dedicated to cold cases was established in the Middlesex DA's office. Here are 3 cases being looked at." Boston.com (July 8, 2019) available at https://www.boston.com/news/crime/2019/07/08/middlesex-district-attorney-cold-case-unit-3-unsolved-murders/. At the very most, the Defendant's concern might supply a basis for redacting the names of individual authors/recipients (such as undercover officers or confidential informants), but surely not all such information. Cf. Boston Globe Media Partners, LLC v. Boston Police Dept.. No. 2184CV00996-F, slip op. at *16 (Mass. Super. Ct. Feb. 22, 2024) (Doolin, J.) (holding it was not apparent, "in contrast to victim and witness information[,] . . . that
 
                                                            -5-
 
            More troublingly still, a substantial number of the Defendant's expressed concerns relate to matters well outside the purview of the investigative exemption, and cut sharply against the grain of the very legislative purposes underlying the PRL itself. Thus, for example, the Defendant cites the risk that members of the public might piece together a "distorted version of the investigation's timeline," and through "perceived gaps, delays, or inconsistencies, they might accuse authorities of negligence, incompetence, or even misconduct." The Defendant complains that "[s]uch misrepresentations could erode public trust in the investigation, fuel speculation and conspiracy theories, and place undue pressure on law enforcement agencies to defend their actions rather than focus on solving the case." (Def.'s. Mot. at p. 7.) Such risks to the reputation of law enforcement, however, are the price of transparency in a democracy; and the sunlight of
the PRL is ordinarily the cure rather cause of the harms the Defendant decries. See Mack, 494 Mass. at 9 (noting "primary purpose" of PRL is to permit public to evaluate and scrutinize public servants in the performance of their duties).[5]
            The Defendant similarly suggests that "[a]mateur sleuths might scrutinize communication between law enforcement and prosecutors, accusing them of collusion, misconduct or bias.... [T]hey might [thereby] claim that the case is politically motivated or that investigators were unfairly building a case before gathering sufficient evidence. Such accusations, even if unfounded, could distort public perception, fuel conspiracy theories, and undermine trust in the criminal justice process." (Def.'s Mot. at p. 9.) Once again, the Defendant's impulse to suppress
 
--------------------------------------------
 
basic, mechanical details of a nearly 30-year old !AD investigation [including names of investigators and dates of witness interviews] contain[ed] confidential materials or investigative techniques, such that their disclosure would prejudice the possibility of effective law enforcement").
[5] The Court notes that the PRL does not have standing requirement. See Bougas, 371 Mass. at 64 ("statute ... extends the right to examine public records to 'any person' whether intimately involved with the subject matter of the records he seeks or merely motivated by idle curiosity."). In all events, the public interest in this and other longstanding, unsolved homicide cases is manifest.
 
                                                            -6-
 
what might be unfair criticism of law enforcement and criminal justice, while perhaps understandable, is not a valid ground for the exceedingly expansive construction of the PRL's investigative exemption it urges. Short of records disclosures that would materially interfere with an ongoing investigation of crime, the declared purpose of the PRL is to furnish the public with information that promotes understanding but might invite criticism of the government. Keeping information away from citizens in order to stanch such criticism is the very antithesis of the Legislature's intent in enacting the PRL. See Attorney General v. District Att'y for Plymouth Dist., 484 Mass. 260, 263 (2020) ("[G]reater access to information about the actions of public officers and institutions is increasingly ... an essential ingredient of public confidence in government[.]" [citation omitted]).
            The Defendant asserts that "[a]mateur sleuths might take document descriptions out of context, misinterpret investigative findings, or draw premature conclusions that mislead the public. If a description references 'inconclusive forensic evidence,' for instance, online communities might assume the evidence was mishandled or dismiss its relevance entirely, creating unwarranted skepticism about the case's integrity." (Def.'s Mot. at p. 10.) The Defendant likewise worries that "[i]f descriptions hint at conflicts within law enforcement - such as differing investigative theories between agencies - amateur sleuths and conspiracy theorists could exploit this information to claim corruption, incompetence, or cover-ups, undermining public confidence in the case and creating unnecessary distractions." (Def.'s Mot. at p. 11.) Finally, the Defendant suggests that "[a]mateur sleuths and online commentators may misinterpret the assertion of legal exemptions as evidence of a 'cover-up,' fueling public distrust in the investigation. The presence of privileged or classified materials could be misconstrued as an attempt to conceal wrongdoing rather than a necessary measure to protect an active case."
 
                                                            -7-
 
(Def.'s Mot. at p. 11.) Once again, the Court respectfully suggests that these kinds of self-serving political concerns by a government agency fall well outside the scope of the animating purpose of the PRL and its investigative exemption. Far from fulfilling the aspirations of the PRL, the positions urged by the Defendant are an affront to this law's very rationale. See Mack; Attorney General, supra.[6]
            The Defendant does make a fair point that a little knowledge is a dangerous thing, and this trope is perhaps especially apt in the internet age. But the Defendant's response to this reality is to construe a limited exemption from the dictates of the PRL so broadly that no records from any open criminal investigation - no matter how old or sanitized they might be - could ever be made the subject of compulsory disclosure. This would effectively create a blanket pass for law enforcement records having anything to do with unsolved crimes, a result that applicable precedent plainly rejects. See supra.
            Finally, the alternative approach that MDAO has proposed - viz., that it be permitted to submit its own document index for in camera review - turns the order of operations prescribed by the SJC on its head. The SJC has expressly directed that in camera review "should be used 'only in the last resort."' Rahim, 486 Mass. at 553 n.15, quoting Reinstein, 378 Mass. at 295. Notably, the Rahim case concerned materials in which the government's interest in investigative confidentiality arguably approached its zenith - viz., records of a joint FBI and Boston Police Department investigation into a suspect's ties to the Islamic State terrorist organization. Rahim, 486 Mass. at 545. Rejecting a categorical exemption based on the nature of the investigation, the SJC held that (I) the district attorney must sufficient identify the nature and scope of the
 
--------------------------------------------
 
[6] The Court has herein addressed only a representative sample of the objections breathlessly raised in the Defendant's motion. An exhaustive review of the motion's scattershot hypotheticals is surely not necessary; as the Defendant has failed to demonstrate, based on the purposes of investigatory exemption or the subject crime, that the ordered index is likely to prejudice effective law enforcement. See G.L. c. 4, § 7, ,r 26(t).
 
                                                            -8-
 
materials' contents "for a court to infer that disclosure would more likely than not prejudice effective law enforcement"; (2) this could be accomplished through "an itemized and indexed document log" detailing the basis for the exemption; and (3) if, thereafter, an exemption was still questionable, in camera review may be appropriate. Id. at 553.[7] This Court's January 30, 2025 Order does no more than direct the Defendant to provide the same type of index.
            The Court acknowledges that the alternative document index like the one the Defendant describes in its Motion for Reconsideration would be entitled to substantial redaction; but this is precisely what the MDAO is now being invited to do. Namely, prepare an index that adheres to the terms of the Court's January 30 Order, and makes all of the proper redactions that this Order expressly allows. Only after Plaintiff has had time to review and critique such can index, and the Court afforded an opportunity to review the MDAO's asserted grounds as to why specific documents are exempt from public disclosure (even in a redacted form), will it be appropriate for the Court to consider in camera review of the MDAO's unredacted document index or any other materials. See Rahim, 486 Mass. at 553 n.15 (noting that in camera review is disfavored because, "in the absence of an advocate's eye, judges are all too often unable to recognize the significance, or insignificance, of a particular document" [internal quotation omitted]). This is the procedure that the SJC has endorsed, and it is the procedure to which this Court again orders the Defendant to adhere. If the MDAO wishes to press the position it appears to adopt in its Motion to Reconsider (namely, that no records from any non-closed, criminal investigation should ever be subject to PRL disclosure, and that no index compliant with the Court's order can be filed without divulging exempt information), the Court stands prepared to stay its Order
 
--------------------------------------------
 
[7] The Rahim Courts analysis of specific log entries the Suffolk District Attorney's Office provided there provides further instruction of the level of detail the Defendant must provide to meet its burden.
 
                                                            -9-
 
immediately so that the Defendant may pursue an appeal without further delay.
SO ORDERED.[8]
/s/Robert B. Gordon
Justice of the Superior Court
February 19, 2025
 
--------------------------------------------
 
[8] As any in camera review of the Defendants' prepared affidavits would be inappropriate at this stage, see Rahim, supra, and unnecessary to resolve its Motion for Reconsideration, Defendants' motion to file such affidavits under seal is DENIED as untimely and moot. The Court further DENIES Plaintiff's cross-motion for costs and fees, without prejudice to the reassertion of such a request pending evaluation of the sufficiency of the Defendant's compliance with the Court's orders.