## James H. Douglas, Secretary of State v. Windham Superior Court and Barbara and Gerald Wilkinsen

[597 A.2d 774]

No. 89-484

Present: **Allen, C.J., Peck, Gibson, Dooley and Morse, JJ.**

Opinion Filed June 14, 1991

*John H. Chase*, Office of the Secretary of State, Montpelier, for Petitioner.

*Thomas Hayes* of *Miller, Cleary & Faignant, Ltd.* Rutland, for Denise Snyder.

*Otis & Brooks, P.C.*, Montpelier, for Respondents Wilkinsens.

**Dooley, J.** The Vermont Secretary of State, as custodian of the records of the Vermont State Board of Nursing, petitions this Court for extraordinary relief from a trial court order directing him to produce certain documents in response to a pretrial discovery request. We decline to grant the relief requested and dismiss the petition.

Respondents here are the Windham Superior Court and the plaintiffs in a personal injury action against a registered nurse

licensed by the Board, the hospital that employs her, and the hospital's administrator. The suit alleges, inter alia, that defendant nurse injected herself with drugs that should have been administered to plaintiff, Barbara Wilkinsen, and then injected water in the tainted syringes into Barbara Wilkinsen to conceal the diversion. The complaint also alleges that the hospital and its administrator hired the nurse without properly investigating her background and physical condition and that they failed to supervise her properly or monitor her physical condition during the term of her employment.

In the course of pretrial discovery, plaintiffs served requests to produce on petitioner, who is the statutory custodian of the Board's records, seeking the following:

1. Any and all complaints of professional misconduct directed against [the nurse].

2. The complete contents of any and all files maintained by or in the custody of any employee or agent of the Secretary of State concerning any complaint of professional misconduct against and/or any possible discipline of [the nurse], *including the complete contents of any investigative file.*

3. The complete minutes of any meeting of the Vermont State Board of Nursing at which any complaint of professional misconduct on the part of [the nurse] or any disciplinary action or possible disciplinary action against [the nurse] was discussed.

4. Any other records involving the licensure and/or discipline of [the nurse] as a registered nurse.

(Emphasis added.) Petitioner responded by supplying the nurse's application for licensure, the stipulation of settlement of the complaints against her, and the minutes of a Board meeting of June 12, 1989. He moved to quash the balance of the request on grounds that the material requested was privileged and not subject to discovery. The motion was accompanied by an affidavit of petitioner who stated he had personally reviewed the file of the nurse. He indicated that the file contained a report to the Board from one of his investigators transmitting the oral complaint and his preliminary investigation of it. He also indicated that the file contains a more complete report from the investigator, notes made by the executive director of the Board

during the investigation, and notes of a meeting between the investigators and the nurse. The file also contains a stipulation of settlement between the nurse and the Board, a copy of which was provided to respondent. The stipulation contains an admission by the nurse that she diverted drugs for her personal use while employed by the hospital.

The affidavit of petitioner stated reasons why he refused to comply with the request to produce. As to the two reports of the investigator, he asserted that they name persons who provided information and that investigatory procedure "calls for the investigation stage to be confidential, and people providing information are routinely told that." He asserted that complaints often come from nurses and they would be deterred from complaining if they knew the information would be provided to private persons for use in litigation against their employer. He also asserted that the remaining complaints come from patients, who would also be deterred from complaining if details of their medical treatment were to be revealed. Overall, he believed that revealing investigative reports would "undercut the effectiveness of nursing regulation by revealing investigative techniques."

As to the notes of the Board's director, petitioner asserted that these also include the names of persons who provided information and show investigative techniques used. He also stated that these notes recorded settlement negotiations with the nurse and that disclosure of such negotiations would discourage settlements. He concluded that settlements are particularly important in drug abuse cases because cooperation is needed to allow for needed drug treatment.

The trial court considered the affidavit of petitioner, as well as the fact (apparently admitted during the hearing in the trial court) that the names of informants were disclosed to the nurse, and concluded that no applicable privilege existed in Vermont. The court denied the motion to quash. The present petition for extraordinary relief followed.

■ Petitioner asserts that three privileges[1] give him the right to resist disclosure: (1) the investigatory files privilege;

---

[1] Petitioner has not claimed that the patient's privilege applies. See V.R.E. 503.

(2) the informant privilege as set forth in V.R.E. 509; and (3) the restriction on the admission of evidence of settlement negotiations as contained in V.R.E. 408.[2] We agree with the trial court that the latter two contentions can be addressed quickly. Assuming that V.R.E. 509 applies outside the criminal context, this privilege is waived if the identity of the informant is disclosed by the holder, here the Board, to a person "who would have cause to resent the communication" from the informant to the government agency. We can think of no person who would greater resent the communication of the nurse's wrongdoing than the nurse. This privilege, if it existed, was waived.

■ The other asserted source of a privilege is actually a rule of relevancy. See V.R.E. 408. It does not create a privilege. At best, the rule creates an argument that the settlement negotiation information should not be disclosed because it is not relevant and is not "reasonably calculated to lead to the discovery of admissible evidence." See V.R.C.P. 26(b)(1). Petitioner did not make that argument.

Petitioner's strongest argument is the investigatory files privilege. The trial court concluded that no such privilege exists in Vermont. Petitioner recognizes we have never announced such a privilege, either by decision or in the Vermont Rules of Evidence, but urges that we follow the lead of other states in developing such a privilege as part of the common law. See *Killington, Ltd. v. Lash*, 153 Vt. 628, 635, 572 A.2d 1368, 1373 (1990) (recognizing qualified executive privilege); V.R.E. 501(a) ("This rule shall not be construed to prevent the development at common law of other privileges."). He argues that if such a privilege is recognized, it must necessarily cover the information plaintiffs seek.

■■ Before we address this argument, we must stress that we are operating under a very limited scope of review in eval-

---

[2] Petitioner has noted that the Vermont Access to Public Records Act, 1 V.S.A. § 317(b)(5), has an exception from public disclosure for "disciplinary investigation" records of a "professional licensing agency." This exception deals with disclosure to the public generally, not disclosure in response to discovery in litigation. It does not create a privilege. See *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1344 (D.C. Cir. 1984); Toran, *Information Disclosure in Civil Actions: The Freedom of Information Act and the Federal Discovery Rules*, 49 Geo. Wash. L. Rev. 843, 849 (1981).

uating this kind of extraordinary relief petition. We held recently in *Ley v. Dall*, 150 Vt. 383, 386, 553 A.2d 562, 564 (1988), that the intervention of this Court to prevent discovery in the trial court was warranted only on a showing of usurpation of judicial power or clear abuse of discretion. In *State v. Forte*, 154 Vt. 46, 48, 572 A.2d 941, 942 (1990), we stated that this standard is met if petitioner shows an arbitrary abuse of power. Thus, in this Court, petitioner must show more than that the trial court was wrong or gave the wrong reason for its action. When we refer to abuse of discretion, we are saying that the trial court decision must be wrong as a matter of law. See *id*. We will not intervene if there is any ground for the trial court action, even if it is not the ground used by the trial court.[3]

In applying this standard of review, it is also important to emphasize what is in issue. Petitioner does not complain about an inability to present his case to the trial court. All facts relevant to the questions before the trial court were presented in petitioner's affidavit and supporting material. No evidentiary hearing is needed here or in the trial court. Petitioner's complaint is that the court failed to apply the facts to the law and quash the subpoena.[4]

█ We also stress the care with which we must approach any request to create a new privilege. The most important point of privilege doctrine was set forth by Chief Justice Burger in *United States v. Nixon*, 418 U.S. 683, 710 (1974):

Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expan-

---

[3] If there is a single difference between our view of this case and that espoused by the dissent, it lies in the nature of our role in extraordinary review. Under *Ley v. Dall* and *State v. Forte*, we are not applying our normal abuse of discretion standard. Petitioner is not entitled to relief simply by showing that the trial court failed to recognize the privilege, and this is not an appeal of the trial court order. Using the terminology of the dissent, there is here no "case" to remand; we either grant extraordinary relief or deny it.

[4] We must rely upon petitioner's complaint and accompanying material in acting upon the complaint. If petitioner concludes, based on this opinion, that a further showing would result in favorable action in the trial court in whole or in part, he is free to renew his motion to quash. We are confident that the trial court will act in accordance with this opinion.

sively construed, for they are in derogation of the search for truth.

Because of their interference with truthseeking, privileges are strongly disfavored. See, e.g., *Cronin v. Strayer*, 392 Mass. 525, 533, 467 N.E.2d 143, 148 (1984); *Dixon v. Rutgers*, 110 N.J. 432, 446, 541 A.2d 1046, 1053 (1988). Most courts have created a testimonial privilege only when the conditions meet the four-part test for recognition set forth in Dean Wigmore's treatise. See, e.g., *American Civil Liberties Union v. Finch*, 638 F.2d 1336, 1344 (5th Cir. 1981) (privilege for governmental records). The four requirements are:

(1) The communications must originate in a *confidence* that they will not be disclosed.

(2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties.

(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered*.

(4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation.

8 Wigmore on Evidence § 2285, at 527 (McNaughton ed. 1961) (emphasis added). Only if all conditions are present should a privilege be recognized. See *id.*

■ We agree with petitioner that information in official investigatory files can meet the four requirements set forth by Wigmore to warrant an evidentiary privilege in some circumstances. We will assume for purposes of analysis that petitioner is the proper person to claim such a privilege[5] and that the priv-

---

[5] The privilege sought by petitioner must be invoked by the head of the agency that has control over the matter. See, e.g., *United States v. O'Neill*, 619 F.2d 222, 226 (3d Cir. 1980) (relying on similar rule for privilege for state and military secrets developed in *United States v. Reynolds*, 345 U.S. 1, 7–8 (1953)); *Association for Women in Science v. Califano*, 566 F.2d 339, 347–48 (D.C. Cir. 1977); *AgriVest Partnership v. Central Iowa Production Credit Ass'n*, 373 N.W.2d 479, 486 (Iowa 1985). The purpose of the requirement, in part, is to ensure that the agency head has considered the documents involved and developed "'precise and certain reasons for preserving' the con-

ilege can extend to licensing boards.[6] Neither of these assumptions are free from doubt, and both warrant further analysis in the appropriate case. We believe, however, that petitioner has failed to make a sufficient showing to apply the privilege in this case.

Case law and statutes in other states and in the federal system have defined a number of interrelated privileges covering governmental information. Petitioner relies upon the "investigatory files privilege." The privilege was defined, as part of an official information privilege, by proposed Fed. R. Evid. 509(a)(2) as covering governmental information "the disclosure of which is shown to be contrary to the public interest" if it consists of "investigatory files compiled for law enforcement purposes and not otherwise available." This statement is somewhat vague. The coverage of the privilege comes down to a kind

---

fidentiality of the communications." *O'Neill*, 619 F.2d at 226 (quoting *Smith v. Federal Trade Comm'n*, 403 F. Supp. 1000, 1016 (D. Del. 1975)). It is, of course, the privilege of the agency if it chooses to invoke it.

The only interest of the Secretary of State in the records involved in this case is that he is the custodian of the records of licensing boards as an "administrative service" to these boards that includes "maintenance of current files and furnishing secretarial service." 3 V.S.A. § 114(a). In fact, the Vermont State Board of Nursing has a chairperson, 26 V.S.A. § 1574(1), and an executive officer. See 26 V.S.A. § 1575(a). The executive officer has the power to compel the attendance of witnesses at Board hearings by subpoena. See 26 V.S.A. § 1582(b)(4). We have no idea what the views of the Board or its executive officer are with respect to the disclosure of the records in controversy. The Board may believe that all or part of the records involved in this case are properly public or that disclosure to an affected litigant is consistent with the purpose of the Board to "safeguard the life and health of the people of this state." 26 V.S.A. § 1571. In fact, the affidavit of the Secretary of State in this case indicates that the State Nursing Board proceeding was triggered by an "oral complaint" to the Board. 26 V.S.A. § 1582(b)(8) makes a record of a complaint "part of the permanent public record" of proceedings of the Board.

[6] On this issue, petitioner relies primarily on *McClain v. College Hosp.*, 99 N.J. 346, 363, 492 A.2d 991, 1000 (1985), a licensing board case. *McClain* is distinguishable because it is based on the applicability of right-to-know or freedom-of-information laws, a rationale not applicable here. See note 2, *supra*. It also involves interagency opinions or memoranda, a different privilege issue than that present here. Further, we note that New Jersey has adopted an "official information" privilege as a rule of evidence. See N.J.R.E. 32 (codified as 2A N.J.S.A. § 84A-27).

of judicial judgment call—whether the disclosure is contrary to the public interest.

The determination of the "public interest" has turned on a number of judicially created factors. The leading case setting forth the relevant factors is *Frankenhauser v. Rizzo*, 59 F.R.D. 339, 344 (E.D. Pa. 1973), where Judge Becker put forth the following list in a civil rights action based on police brutality:

> In the context of discovery of police investigation files in a civil rights case, however, at least the following considerations should be examined: (1) the extent to which disclosure will thwart governmental processes by discouraging citizens from giving the government information; (2) the impact upon persons who have given information of having their identities disclosed; (3) the degree to which government self-evaluation and consequent program improvement will be chilled by disclosure; (4) whether the information sought is factual data or evaluative summary; (5) whether the party seeking the discovery is an actual or potential defendant in any criminal proceeding either pending or reasonably likely to follow from the incident in question; (6) whether the police investigation has been completed; (7) whether any . . . disciplinary proceedings have arisen or may arise from the investigation; (8) whether the plaintiff's suit is non-frivolous and brought in good faith; (9) whether the information sought is available through other discovery or from other sources; and (10) the importance of the information sought to the plaintiff's case.

While the precise description of the factors will vary depending on the nature of the case involved, the *Frankenhauser* list represents the most complete and widely accepted itemization of the relevant considerations.

■ Although petitioner has argued that the application of the factors should have required the trial court to grant the motion to quash, he recognizes that the court may be able to evaluate the competing considerations only after an in camera inspection of the file. We recognize that the showing that petitioner must make to get to an in camera inspection is less than the showing he must make to prevail on his motion to quash. It is important, however, to insist that petitioner meet a reasonable threshold before the court must make the inspection.

■ The routine use of an in camera inspection is not a satisfactory resolution of the balancing of interests the privilege requires. "There is . . . reason to be concerned about the possible due process implications of routine use of *in camera* proceedings." *United States v. Zolin*, 491 U.S. 554, 571 (1989) (attorney-client privilege). In camera proceedings are extraordinary events in the constitutional framework because they deprive the parties against whom they are directed of the basic requirement of due process—the opportunity to be heard. *In re Taylor*, 567 F.2d 1183, 1187–88 (2d Cir. 1977). Thus, they must be justified and allowed by a compelling state interest. *Id.* at 1188. Further, they place a special burden on the trial court because they require the court to make important and sensitive decisions "without open adversarial guidance by the parties." *Zolin*, 491 U.S. at 571. Indeed, the burden is often greater because the side holding the documents gives knowledgeable, adversarial advice while the other side cannot articulate an informed position.

■ It is important to recognize that the situation here is different from that in the recent case of *Killington v. Lash*, where the Governor was asserting an absolute privilege and the court conditioned recognition of the privilege on inspection of the material in the face of a showing of private need for the disclosure of the information. In *Killington*, the scales started in favor of nondisclosure, and the individual seeking the information had to demonstrate need to require the court to balance. 153 Vt. at 639, 572 A.2d at 1375. In this case, the scales must start on the side of disclosure, and the government must make a showing to require the court to balance. See *Assured Investors Life Ins. Co. v. National Union Assocs.*, 362 So. 2d 228, 233 (Ala. 1978). This case and *Killington* should be the same, however, in the sense that the party who has the initial burden cannot require the court to make an in camera examination without meeting that initial burden. Thus, an order for an in camera inspection was reversed in *Killington* because of the failure of the petitioner to show need for the information. *Killington*, 153 Vt. at 639, 572 A.2d at 1375. For the same reason, no order of in camera inspection can be imposed here.

The case law on the investigatory files privilege is clear that a minimum showing is required before the court must balance the

interests, and the precedents are relatively consistent on what must be in that showing. See, e.g., *Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336, 1342 (D.C. Cir. 1984). It is best described in the recent decision of Judge Weinstein in *King v. Conde*, 121 F.R.D. 180, 189 (E.D.N.Y. 1988), as follows:

> The party seeking to invoke the privilege bears the burden of justifying its application. The government must specify "which documents or class of documents are privileged and for what reasons." This threshold showing must explain the reasons for nondisclosure with particularity, so that the court can make an intelligent and informed choice as to each requested piece of information. "Unless the government, through competent declarations, shows the court *what interests* [of law enforcement or privacy] would be harmed, *how* disclosure under a protective order would cause the harm, and *how much* harm there would be, the court cannot conduct a meaningful balancing analysis." If the police make no such showing, the court has "no choice but to order disclosure."
>
> The privilege will be deemed asserted when the objecting party timely invokes the privilege as to each discovery result thought to invade the privilege . . . [and files] "a declaration or affidavit . . . from a responsible official within the agency . . . ." This statement must be based on personal review of the documents by an official in the police agency (not the defendant's attorney) and must explain (not merely state conclusorily) how the materials at issue have been generated or collected; how they have been kept confidential; what specific interests (e.g. of the police officers, of law enforcement, or of public concern) would be injured by disclosure to plaintiff, to plaintiff's attorney, and to the public; and the projected severity of each such injury. This procedure should discourage applications for non-revelation in all but deserving cases.

(citations omitted; emphasis in original). Petitioner's case for withholding the information is based on exactly the sort of conclusory claims that Judge Weinstein and others have found inadequate. A comparison of the claims made with the *Frankenhauser* factors discloses how inadequate the showing was in this case.

Before looking at the *Frankenhauser* factors, however, we should emphasize that it is entirely appropriate for this Court to do so in an extraordinary relief proceeding. Petitioner submitted to the trial court and to this Court all the information relevant to its claim of privilege, and there are no facts in issue. As we emphasized earlier, petitioner is not entitled to extraordinary relief if there is any ground for the trial court action. Thus, we will deny relief if the trial court could have found that petitioner failed to make a threshold showing in this case, *even though the trial court never evaluated petitioner's showing on the merits.*

Petitioner relies primarily on the first two *Frankenhauser* factors: the impact disclosure will have on the ability of the government to obtain information and the impact on persons who have given information of having their identities disclosed. He makes a number of assertions: (1) individuals interviewed are routinely told the investigation is confidential and the reports in the file disclose the identities of individuals who spoke with the investigators; (2) nurses and patients would be deterred from complaining if they knew that the information might be used by private litigants; and (3) investigative techniques will be disclosed, thereby undercutting the effectiveness of nursing regulation.

All of the petitioner's claims are conclusory and may or may not apply to this particular case. They do not meet petitioner's burden. The case law shows a great reluctance for courts to act on these kinds of broad generalizations that disclosure will impair administrative processes. The court in *Frankenhauser* stressed that "rare instances of disclosure" due to civil suits will not deter citizens from revealing information to law enforcement officials. The court noted that "the average citizen is . . . willing to cooperate with law enforcement officials." *Frankenhauser*, 59 F.R.D. at 344.

Particularly misdirected is the claim that nurses will not speak candidly[7] if they know that disclosure to litigants is possible. We find no specific support for the generalization that

---

[7] As noted earlier, the statements of the one nurse who has reason not to be candid, the defendant in the underlying case, were protected from disclosure by the trial court.

nurses, whose profession is dedicated to patient care, will conceal or distort information to prevent injured parties from seeking redress from their employers. See *King v. Conde*, 121 F.R.D. at 193; see also *In re Franklin Nat'l Bank Securities Litigation*, 478 F. Supp. 577, 586 (E.D.N.Y. 1979) (government's argument that disclosure of confidential bank examination report will chill the relationship between bank officials and examiners "exaggerates the danger"). If we are to make a generalization, the more likely result of disclosure is that candor will be increased, not chilled. See *Mercy v. County of Suffolk*, 93 F.R.D. 520, 522 (E.D.N.Y. 1982). As the court emphasized in *Mercy*, knowledge that others may view a witness's statement "may serve to insure that these investigations are carried out in an even-handed fashion, that the statements are carefully and accurately taken, and that the true facts come to light, whether they reflect favorably or unfavorably on the [defendants]." *Id.*

Nor does petitioner have any serious interest in protecting the name of informants. The names of these persons have been disclosed to the nurse who is the defendant in the underlying lawsuit; it is difficult to see how additional disclosure to plaintiffs will have a further impact on their interests. There is no allegation that any of these individuals were promised anonymity—the disclosure to the nurse demonstrates that such a promise is not present or it has already been broken. We are not involved with criminal prosecution of a serious crime where witnesses may have valid fears for their personal security. If necessary, the court can impose a "gag order" limiting public disclosure of the names of the informants by plaintiffs or plaintiffs' counsel.

Nor do we find weighty the broad and general claim that investigatory techniques may be disclosed. While the privilege has been held to be broad enough to protect against the disclosure of "newly developed investigative techniques," S. Stone & R. Liebman, Testimonial Privileges § 9.22, at 534 (1983), there is no specific claim here that disclosure of Board investigatory methods will be compromised so that nurses engaging in disciplinary violations will use the information to prevent disclosure of their actions or to prevent investigation. See *id.* (privilege limited to circumstances where disclosure would compromise "the usefulness of the technique in future investigations").

The third and seventh factors, the need for governmental self-evaluation and the presence of intradepartmental disciplinary proceedings, are apparently not relevant in this case. Nor can we evaluate the fourth factor, as petitioner has failed to provide us with specific information about the documents to determine the extent to which they contain evaluations of the evidence gathered in the investigation.

The fifth and sixth factors deal with the interrelationship of the litigation to the investigation and the current status of the investigation. The extent to which the litigation can interfere with an investigation is more limited in the context of a disciplinary proceeding than in the context of a criminal investigation. There is no indication that any of the parties in the underlying litigation are present or future defendants in a criminal proceeding. We are not concerned either that discovery in the civil litigation will provide a defendant with information not otherwise obtainable under criminal discovery rules; or that discovery in the civil proceeding will interfere with the rights of a defendant in a criminal proceeding. Cf. *State v. Begins*, 147 Vt. 295, 298, 514 A.2d 719, 722 (1986) (State's opportunity to coerce self-incriminating testimony by scheduling probation revocation hearing prior to criminal trial poses danger of abuse to judicial decision-making process).

It is particularly significant that the Board's disciplinary proceeding has concluded. The Vermont Board of Nursing accepted the stipulated settlement in June of 1989, well before the disclosure order. A major, if not dominant, purpose of the investigative files privilege is to prevent discovery from interfering with an ongoing law enforcement investigation or proceeding. Thus, a summary of the case law concluded: "When an investigation has been completed, the consensus is that a litigant should be allowed access to law enforcement files." Note, *Discovery of Government Documents and the Official Information Privilege*, 76 Colum. L. Rev. 142, 158–59 (1976). Including this factor in an extensive list of relevant factors means that it is not alone determinative. It is, however, entitled to very significant weight in the ultimate balancing process. See *United States v. Leggett & Platt, Inc.*, 542 F.2d 655, 659 (6th Cir. 1976), *cert. denied*, 430 U.S. 945 (1977); *Mehau v. Gannett Pacific Corp.*, 66 Haw. 133, 156, 658 P.2d 312, 327 (1983); *Laws v. Thompson*, 78

Md. App. 665, 691, 554 A.2d 1264, 1277 (1989) (investigative files privilege does not apply when "specific investigation or governmental undertaking ends").

The eighth, ninth and tenth factors deal with the nature of plaintiffs' underlying case, the importance of the discovery sought to the case and the availability of the information from other sources. Petitioner has provided us very little information from which to evaluate these factors. The underlying lawsuit is a very serious personal injury action involving allegations of damage to a hospital patient from the misuse of drugs by a nurse. The stipulation of settlement between the Nursing Board and the nurse includes admissions by the nurse that she violated disciplinary rules by being "habitually intemperate in the use of habit forming drugs" and by "diverting drugs for her personal use while employed at . . . [defendant] hospital." While the record does not disclose this specifically, there is every reason to believe that the investigation covered the alleged incident that gave rise to the underlying lawsuit.

The trial court concluded that "[b]oth the need for, and the relevancy of the material sought has been amply demonstrated by the plaintiffs." It also concluded that the material may not be readily available from other sources. Petitioner has not questioned the trial court's conclusions or plaintiffs' need for the material, asserting instead a blanket and absolute right to withhold it.

The need for discovery materials of this kind, based in part on the unavailability of alternatives, is particularly strong where plaintiffs have sued an employer of the individual who committed the alleged tortious acts. Plaintiffs will probably have to show that the employer was aware of the nurse's misconduct, or can be charged with that knowledge, and failed to take action. Thus, they must determine the extent of both the misconduct and the knowledge of the misconduct, the type of information that is likely to arise in the Board's investigation. See *Crawford v. Dominic*, 469 F. Supp. 260, 263 (E.D. Pa. 1979) (importance of the information to plaintiffs' case is the weightiest factor); *Martinelli v. District Court*, 199 Colo. 163, 173, 612 P.2d 1083, 1090 (1980) (same).

Finally on this point, it is significant that petitioner has failed in any way to accommodate the legitimate needs of the plain-

tiffs. See *United States v. O'Neill*, 619 F.2d 222, 227 (3d Cir. 1980) (indiscriminate claim of privilege can be "sufficient reason to deny it"). For example, petitioner refuses to release even the names of complainants and persons who gave information to the Board to enable plaintiffs to conduct their own investigation even though those names went to the nurse. With the lack of even minimal cooperation from petitioner, the paths available to gather the necessary information are simply too tortuous to be reasonable alternatives to the disclosure of petitioner's records.

When we engage in balancing of the relevant factors in light of petitioner's duty to support his privilege claim with detailed and not conclusory reasons why disclosure is not in the public interest, related specifically to the documents involved and the information contained therein, there is virtually no basis for keeping the records from the plaintiffs. Not only do most factors point toward disclosure, petitioner has failed to make any showing why the factors that *might* support confidentiality have any weight in this case.

 Although the trial court was in error in concluding that no investigatory files privilege exists in Vermont, it could have denied relief on the ground that petitioner has failed to make a sufficient showing to apply the privilege in this case. Since petitioner has failed to show that there is no ground for the trial court's action, extraordinary relief is inappropriate.

*Petition for extraordinary relief dismissed.*

**Peck, J.,** concurring and dissenting. The majority concedes that a privilege for investigative files exists, at least theoretically, in Vermont, and on that point I am in complete agreement. Presumably, that privilege will be recognized hereafter on a case-by-case basis, with the majority opinion providing the guiding standards under which trial courts will weigh claims of the investigatory files privilege.

Since this matter is before us as a petition for extraordinary relief, raising the central issue of the existence of the privilege, the limited nature of our role would suggest that we provide the answer and then remand the case for appropriate action by the trial court, based on the announcement of our holding and the tests to be applied by the court in determining the validity of

this particular claim. But the majority, for reasons that are not articulated, goes on to decide the merits of this petitioner's claim to the privilege, on the basis of an essentially barren factual record, without giving the parties an opportunity to make their threshold showings and without allowing the trial court, on the basis of those showings, to weigh the competing claims of privilege and disclosure and reach a decision—which is what trial courts are supposed to do.

The decision will cloud the roles of this Court and trial courts in future cases in which this privilege is asserted, and will assuredly invite other litigants to look to us to find facts and order dispositions in future cases of all kinds that arrive here for legal guidance only. I therefore dissent.

## I.

Let me begin, as I think we must in all cases where a new privilege is asserted, with a review of the specific subject matter before us.

Medical records, including those which derive from a governmental investigatory source, are of a peculiarly sensitive nature to the extent they may relate to doctors, nurses and other technicians on the one hand and patients or former patients on the other, who have no relation whatever to litigation in which one of the parties seeks disclosure. It is difficult to imagine many more frightening situations in which the privacy interests of the latter class may be subject to public exposure, without their knowledge or any opportunity to be heard in protest should they wish to do so.

In *State v. Kirchoff*, 156 Vt. 1, 587 A.2d 988 (1991), this Court, as it was constituted for purposes of hearing that case, extended the so-called right to privacy to the most vicious of criminals, even where it was necessary to expand the Vermont Constitution to do so, and in a manner not recognized under the United States Constitution, or the constitutions of the great majority of our sister states. Yet in this case, the same majority shows not the slightest concern for the privacy of individuals who are innocent of any possible culpability in the matter sub judice. The opinion pays lip service to this concern, but when it indulges in its own factfindings, a function reserved exclusively to trial courts, postulates hypothetical situations, and draws its

own conclusions without the benefit of facts from below or requiring a showing of need, the shallowness of the concern is manifest.

## II.

Turning to my specific grounds for dissent, the majority writes as if the central issue in this case were the trial court's reluctance to conduct an in camera inspection, when, in fact, the heart of the case centers on whether there is a privilege for investigatory files, and whether petitioner has met the standards for asserting that privilege.

But I will begin on the majority's terms, with the in camera inspection. The trial court declined to conduct an in camera inspection because it concluded, contrary to the unanimous views of this Court, that there is no such thing as an investigatory files privilege. The court never considered the Wigmore or *Frankenhauser* criteria because it never got to them. If the trial court had recognized the existence of an investigatory privilege, the court would have gone on to consider whether or not such a showing had been made, using any appropriate fact-finding process, including an in camera inspection, if necessary, to aid the court in weighing the validity of the privilege claim in light of the dozen or more criteria set forth in the majority opinion.

My main point is that trial courts are uniquely positioned to make initial factual findings, and appellate courts are notoriously bad at doing so. This case is a perfect illustration of the point. The majority does not review a determination as to whether the investigatory privilege should be applied, based on the merits of the parties' respective showings under the applicable criteria (e.g., *Frankenhauser*), because there were no showings. There was no factual record. Instead, this Court undertakes the *Frankenhauser* analysis by itself, without the benefit of a trial record, and, needless to say, without the benefit of its own in camera inspection. The majority states:

> We recognize that the showing that petitioner must make to get to an in camera inspection is less than the showing he must make to prevail on his motion to quash. *It is important, however, to insist that petitioner meet a reasonable threshold before the court must make the inspection.*

No court need, or should, conduct an in camera inspection without a proper showing, but the majority errs in concluding that the degree of showing is always the same. The main point is that the trial court has never had a chance to decide whether petitioner has met his threshold. The majority treats the case as if there had been a full hearing below, with a full evidentiary record. Lacking that record, the majority's own factfinding smacks of the crystal ball.

*Friedman v. Bache Halsey Stuart Shields, Inc.*, 738 F.2d 1336 (D.C. Cir. 1984), cited by the majority, is an excellent short treatise on what a party asserting the privilege must do to prevail. In that case a party in a civil lawsuit arising out of dramatic fluctuations in the price of silver subpoenaed investigatory records of the Commodities Future Trading Commission (CFTC). The court of appeals confirmed the privilege claimed by the CFTC.[1] But the court went on to conclude that "the existence of a qualified law-enforcement investigatory files privilege as to all of the subpoenaed documents had not been sufficiently established by CFTC so as to support wholesale and final rejection of Friedman's motion to compel compliance." *Id.* at 1341.

Allow me to quote at length—the court's words could well be mine in this case, *mutatis mutandis*—from what then followed in *Friedman*:

> CFTC's attorney in the district court had suggested disclosure would reveal law enforcement techniques and sources: disclose strategy, procedures, and direction of the

---

[1] The court said on this point:
> There surely is such a thing as a qualified common-law privilege, within the meaning of Fed. R. Civ. P. 26(b), for law-enforcement investigatory files.

738 F.2d at 1341. Other federal and state courts have recognized a similar qualified privilege for investigations conducted by boards and bodies, even though possible criminal prosecution may not be the reason for the investigation. See, e.g., *Center for National Policy Review on Race & Urban Issues v. Weinberger*, 502 F.2d 370, 373 (D.C. Cir. 1974); *Bristol-Myers Co. v. FTC*, 424 F.2d 935, 939 (D.C. Cir.), *cert. denied*, 400 U.S. 824 (1970); *Reinstein v. Police Commissioner of Boston*, 378 Mass. 281, 290, 391 N.E.2d 881, 886 (1979); *McClain v. College Hospital*, 99 N.J. 346, 357, 492 A.2d 991, 996 (1985); *Beck v. Bluestein*, 194 N.J. Super. 247, 257, 262–63, 476 A.2d 842, 849, 851 (1984).

investigation, forewarn suspects, deter witnesses from providing candid testimony, invite others to seek discovery. However, the files had not been examined for this purpose by responsible members or officers of CFTC. No specific documents or classes of documents had been identified.

Until the claim of privilege has been presented to a district court with appropriate deliberation and precision and the duty of the demanding party to show his or her need for disclosure has thus been triggered, and until that duty has then been discharged by the demanding party, *the district court is not equipped to engage in the task of identifying and weighing the competing interests. When, as here, the privilege claimed is qualified, not absolute, the process of identification and weighing cannot be avoided.*

*Id.* at 1342 (emphasis supplied). The question always before the trial court is whether the party asserting the privilege has provided "a deliberate and reasonably specific delineation of the claim," *id.* at 1343, not whether the party asserting the privilege has met the threshold burden of justifying an in camera inspection. Such inspection is simply one of the factfinding devices the court can undertake in pursuing the "task of identifying and weighing the competing interests." *Id.* at 1342.[2]

---

[2] One of my main concerns is that the majority establishes a separate threshold showing required to justify conducting in camera inspections, when, in fact, the showing should focus on the need for the privilege, with the in camera inspection serving merely as a tool which the court may or may not use.

The majority's citation of *United States v. Zolin*, 491 U.S. 554 (1989), to support the propostion that in camera inspections are "extraordinary events" is misleading at best. The issue in that case was not whether the court should cooperate with one asserting a privilege and seeking in camera inspection to help persuade the court, but whether, on the contrary, such review in certain cases would be detrimental to the rights of a party asserting a privilege and opposing in camera review. Speaking of the attorney-client privilege, the Court said:

A blanket rule allowing *in camera* review as a tool for determining the applicability of the crime-fraud exception, as [*United States v. Reynolds*, 345 U.S. 1 (1953)] suggests, would place the policy of protecting open and legitimate dislosure between attorneys and clients at undue risk. . . .

There is no reason to permit opponents of the privilege to engage in groundless fishing expeditions, with the district courts as their unwitting (and perhaps unwilling) agents.

The "proper showing" required before a court will order an in camera inspection will depend on the circumstances of the case, particularly whether the party asserting the privilege has made the initial demonstration of specificity and inspection is "appropriate." *Id.* at 1344. The threshold showing by the asserting party, not the in camera inspection itself, is the issue.[3] The judgment call on inspection is initially the trial court's, as is the initial judgment as to whether the claims of privilege outweigh the need for the information, under the several-pronged test that the majority and I agree should be applied. The process we set forth in *Killington* as to the closely related executive privilege will, with appropriate modifications, serve to guide courts in weighing the claim of privilege against a discovery demand by a litigant. A trial court should order in camera inspection of the materials sought and should try to balance the interests with an eye to the specific needs of the litigant and the interest in confidentiality attendant to the particular board or body involved. The Supreme Court of California noted some useful principles in *Shepherd v. Superior Court*, 17 Cal. 3d 107, 126, 550 P.2d 161, 171–72, 130 Cal. Rptr. 257, 267–68 (1976):

---

*Id.* at 571; see also *Kerr v. United States District Court*, 426 U.S. 394, 406 (1976) (stating that "*in camera* review is a highly appropriate and useful means of dealing with claims of governmental privilege").

[3] This point is well stated in *King v. Conde*, 121 F.R.D. 180, 189 (E.D.N.Y. 1988), which was cited by the majority. The editor's precis of the case at the beginning of the report suggests that a "showing of need must be made by police before placing burden of in camera inspection on magistrate." *Id.* at 181. What the case actually holds is that accompanying the assertion of a privilege must be "a declaration or affidavit, under oath," stating "how the materials at issue have been generated or collected; how they have been kept confidential; what specific interests (e.g. of the police officers, of law enforcement, or of public concern) would be injured by disclosure . . . and the projected severity of each such injury." *Id.* at 189. Without an initial showing, of course, the court would simply order disclosure. But once the formal threshold is met—if the assertion is not frivolous—the trial court's real work begins:

If the court finds the defendant has not satisfied its threshold burdens, direct disclosure is in order. If the threshold burdens are met, the court may then review the materials at issue *in camera* and decide which, if any, to withhold from disclosure.

*Id.* at 190. The court goes on to discuss the value of redaction by the judge in balancing the interests of privilege and disclosure. *Id.*

Implicit in each assessment is a consideration of conse-
quences—i. e., the consequences to the litigant of non-
disclosure, and the consequences to the public of
disclosure. The consideration of consequences to the liti-
gant will involve matters . . . including the importance of
the material sought to the fair presentation of the litigant's
case, the availability of the material to the litigant by other
means, and the effectiveness and relative difficulty of such
other means. The consideration of the consequences of dis-
closure to the public will involve matters relative to the ef-
fect of disclosure upon the integrity of public processes and
procedures . . . .

To this list of principles we might add that the consequences
to any confidential informant and the potential effect on the fu-
ture investigative powers of the governmental agency may be
an appropriate matter for consideration by the court in balanc-
ing the competing interests.

Respondents argue finally that the trial court has already
performed a weighing analysis "based on the types of material
the Secretary of State represented were contained in the file
and, in fact, ruled a portion of the file to be privileged." The trial
court record does not support this contention. The court did not
conduct an in camera inspection and in fact specifically stated
that "[t]he 'investigative files' privilege does not exist in the
State of Vermont," thereby rendering an inspection unnecess-
ary.

The majority, for reasons that are not apparent, does not
choose to remand this case for the proper application of the
balancing of interests, as was done in *Friedman*. I am unaware
of any case where an appellate court, upholding the existence of
a particular privilege, and concluding that the trial court either
misunderstood or misapplied the privilege, goes on to balance
the interests of the parties before the trial court has had a
chance on remand to evaluate whether a threshold assertion of
the privilege has been made, and if so, whether, or to what ex-
tent, the claim is justified, given the other party's interests in
disclosure.

The majority does all of that for itself, on the basis that the
Secretary of State has not made any showing, when in fact the
court below preempted any showing by either side (with or

without an in camera review) by declaring that no investigative files privilege exists in Vermont. Some of the majority's "findings" are clothed as broad, judicially noticeable truths:

> Particularly misdirected is the claim that nurses will not speak candidly if they know that disclosure to litigants is possible. We find no specific support for the generalization that nurses, whose profession is dedicated to patient care, will conceal or distort information to prevent injured parties from seeking redress from their employers.

There was no evidence of anything below because there was a ruling that there was no privilege to address. If petitioner had the opportunity to make a showing, he might be able to address the privilege relevant to the nurses concerned with the impact of this disclosure, rather than to theoretical nurses in a hypothetical time and place.

The Court continues with more appellate findings:

> Nor do we find weighty the broad and general claim that investigatory techniques may be disclosed. While the privilege has been held to be broad enough to protect against the disclosure of "newly developed investigative techniques," [citation], there is no specific claim here that disclosure of Board investigatory methods will be compromised so that nurses engaging in disciplinary violations will use the information to prevent disclosure of their actions or to prevent investigation.

I have no idea what petitioner would be able to demonstrate if asked to make a detailed showing by the trial court, as is the universal custom in these cases. The majority might be correct. Maybe not. The point is that the trial court should make the determination, based upon that part of the holding over which we have no differences—the existence of the privilege and the kinds of criteria that must be considered by the court in deciding the matter.

I will not trace out all of the majority's findings under the rest of the *Frankenhauser* criteria. But it is important to note that the majority refers to petitioner's failure "to provide us specific information," as if the trial court had recognized a privilege but failed to weigh competing interests appropriately.

I should also add that the majority feels as free to find crucial facts about the needs of respondents for discovery as it does to

find facts about petitioner's lack of a showing of support for the privilege:

> The need for discovery materials of this kind, based in part on the unavailability of alternatives, is particularly strong where plaintiffs have sued an employer of the individual who committed the alleged tortious acts.

The Court even concludes, before the fact, that:

> [P]etitioner has failed in any way to accommodate the legitimate needs of the plaintiffs. . . . With the lack of even minimal cooperation from petitioner, the paths available to gather the necessary information are simply too tortuous to be reasonable alternatives to the disclosure of petitioner's records.

At this stage of the proceeding, with a scant record below, I am unwilling to pass judgment on what is feasible or necessary for respondents or reasonable for petitioners. Even more importantly, the trial court can, and in difficult or complex cases definitely should, frame detailed orders that deal with the parties' impasse and reach a result that is as fair as possible to both sides. As the court said in *King v. Conde*:

> The parties and the court should consider carefully the benefits and costs of a properly designed protective order. "Routinely" issuing protective orders . . . will not necessarily promote justice or the proper balance of interests; in particular cases, the court may find them an effective way to permit discovery without undermining law enforcement.

121 F.R.D. at 190. Respondents may or may not be able to demonstrate that the files in petitioner's control are the sole source of the names of witnesses or of relevant evidence, in which case petitioner's prima facie showing of the need for confidentiality might prevail. If petitioner's concern is over opinions or conclusions within the file, it may be possible to include only some parts of the file and even to redact documents in question to eliminate materials that might encroach on a demonstrated need for confidentiality. By acting as trial court here, the majority cuts off an important trial court function and stanches the flexibility and practicality that should accompany court orders resulting from claims of privilege.

## III.

I would remand this matter to the trial court for proper consideration and disposition. The majority recognizes the privilege, but goes on to decide the case here, leaving little practical guidance to judges considering this privilege beyond stating the *Frankenhauser* standards. I too am concerned about the possible misuse of this privilege, and though I dissent from the majority's decision, I must go further than the majority has done in stating the limited nature of this very narrow privilege.

First, the propensity to justify the unqualified closure of government files by the style of the label on the front of the file is particularly troublesome. *Bristol-Myers v. FTC*, 424 F.2d at 939. A board or body may consider much of its routine business to be "investigatory," and I would warn that we do not intend that the files be considered automatically privileged by self-serving labelling. But when "the inquiry departs from the routine and focuses with special intensity upon a particular party, an investigation is under way." *Center for National Policy Review on Race & Urban Issues v. Weinberger*, 502 F.2d at 373.

I think we ought to make much clearer that we reject the rationale adopted in some cases that the "invasion of the administrative process" alone necessarily gives rise to the nondisclosure privilege. *Farrell v. Piedmont Aviation, Inc.*, 50 F.R.D. 385, 386 (W.D.N.C. 1969). The notion that an agency may resist a claim to information, based solely on the fact that its administrative process would be inconvenienced or simply because some aspect of its functioning is exposed to public view, should have vanished long ago.

Thus, I would add to our holding that the qualified privilege for administrative investigatory files or reports prevails over a litigant's discovery request only when a true need for the requested information has not been demonstrated and the interest of the litigant is less than the government interest in secrecy.

Respondents are correct that exceptions within the Vermont Access to Public Records statute, 1 V.S.A. ch. 5, subch. 3, specifically the exception in 1 V.S.A. § 317(b)(5) for "records . . . compiled in the course of a criminal or disciplinary investigation by any police or professional licensing agency," do not control the outcome of a discovery request under V.R.C.P. 26. See

*Friedman,* 738 F.2d at 1344; Toran, *Information Disclosure in Civil Actions: The Freedom of Information Act and the Federal Discovery Rules,* 49 Geo. Wash. L. Rev. 843, 849 (1981). As the *Friedman* court stated:

> In the discovery context, when qualified privilege is properly raised, the litigant's need is a key factor. Whether the information is disclosed depends on the relative weight of the claimant's need and the government's interest in confidentiality. It is unsound to equate the FOIA [federal Freedom of Information Act] exemptions and similar discovery privileges.

738 F.2d at 1344 (citations omitted). However, exceptions within the Access to Public Records statute can guide the court in appraising public policy concerns and weighing those concerns together with the needs of litigants in the discovery process, which concerns are no less a vital aspect of public policy. Statutory exemptions may be based on "values entitled to weighty consideration." Note, *Discovery of Government Documents and the Official Information Privilege,* 76 Colum. L. Rev. 142, 153 (1976); see *McClain v. College Hospital,* 99 N.J. at 357, 492 A.2d at 996; see also *Advisory Committee Notes, Rule 509, Proposed Federal Rules of Evidence,* Revised 1971 Draft, 56 F.R.D. 183, 253 (1972) ("[T]he exceptions [to the Freedom of Information Act] are based on values obviously entitled to weighty consideration in formulating rules of evidentiary privilege.").

As with any like privilege, the important determination is not that it exists, but rather in the careful balancing of the interests of government and those of the litigant seeking discovery. Like all privileges, this privilege may sometimes result in the suppression of truth. *Grodjesk v. Faghani,* 104 N.J. 89, 96, 514 A.2d 1328, 1331 (1986). Consequently, the most careful balancing of competing interests is required on a case-by-case basis.

The task of evaluation of the materials in the present case should not be a complicated one. The fact that the investigation by the Board was not criminal in nature may impact on the need of the petitioner not to reveal its investigative methodology. Cf. *Reinstein v. Police Commissioner of Boston,* 378 Mass. 281, 291, 391 N.E.2d 881, 887 (1979) ("Although '[t]here is no clear distinction between investigative reports and material that, de-

spite occasionally alerting the administrator to violations of the law, is acquired essentially as a matter of routine,' still the distinction is taken lest the [investigative] exemption 'swallow[] up the Act.'") (citations omitted).

In sum, I believe the majority is correct in acknowledging the existence of a privilege for investigatory records, but this Court ought to remand and allow the trial court to do its work.

I am authorized to say that Justice Gibson joins in this opinion, except for Part I.