Katherine **LAWSON** and Bradley Lawson, individually and as parents and guardians of their daughter, Jordan Lawson, Plaintiffs,

v.

**FISHER–PRICE, INC., Defendant.**

No. 2:99–CV–25.

United States District Court,
D. Vermont.

Dec. 6, 1999.

Gareth Hiley Caldbeck, Caldbeck & Schweitzer, Shelburne, VT, for plaintiffs.

Susan P. Ritter, Powers, English, Carroll & Ritter, Ltd., Middlebury, VT, Harold J. Friedman, Tracy D. Hill, Friedman Babcock & Gaythwaite, Portland, ME, for Fisher–Price, Inc., defendant.

## OPINION AND ORDER

SESSIONS, District Judge.

In this product liability case, Plaintiffs Katherine, Bradley and Jordan Lawson ("the Lawsons") claim that Jordan Lawson suffered brain injury when she choked on a rattle ("Flower Rattle") manufactured by Defendant Fisher–Price, Inc. ("Fisher–Price"). The Lawsons have moved to compel documents related to communications between Fisher–Price and the U.S. Consumer Product Safety Commission ("CPSC") concerning the rattle. Fisher–Price filed a motion for a protective order to bar disclosure of such communications. Fisher–Price seeks protection on privilege grounds, and has submitted the contested documents under seal for *in camera* review. For the reasons stated below, the Court GRANTS in part Plaintiff's motion to Compel (paper 9), and GRANTS in part Defendant's Motion for Protective Order (paper 15).

### I. *Factual Background*

In the early 1970s, Fisher–Price began the production of the Flower Rattle, a rattle which had a 1.5″ red ball on one end. In 1979, the company redesigned the rattle, so that the rattle no longer had a 1.5″ ball on the end. Prior to the redesign of the product, over four million Flower Rattles were sold by Fisher–Price.

In the early 1980's, the Consumer Product Safety Commission ("CPSC") investigated Fisher–Price toys, including the Flower–Rattle. An investigatory file was created, but CPSC took no action against Fisher–Price. Following the 1988 death of a child who allegedly choked on a Flower Rattle, Fisher–Price again had contact with CPSC; again CPSC required neither recall of the Flower Rattle nor public notification. In order to comply with CPSC monitoring, Fisher–Price also compiled various documents which it kept on file. These documents are the subject of the present motion to compel. At no time did Fisher–Price recall the Flower Rattle on its own initiative, or notify the public of the alleged dangerousness of the toy.

On May 22, 1997, Jordan Lawson allegedly choked on a Flower Rattle which had a 1.5″ ball on the end, leaving her severely brain-damaged. The Lawsons brought the present product liability action. Plaintiffs filed Interrogatories, Requests for Production and Requests for Admissions in an attempt to establish, *inter alia:* 1) Defendant's knowledge of the dangers posed by the Flower Rattle, 2) the foreseeability that a child would choke on the Flower Rattle, or toys similar in design, and suffer brain damage, 3) alternative designs that were available at times when the product was manufactured, 4) the Defendant's design objectives in manufacturing the Flower Rattle and other similar products, 5) information related to Defendant's failure to consider notification of the dangers to the public of products having spherical balls with a diameter of 1.5″, 6) information showing that Defendant did consider notifying the public, but chose not to, and the reasons for this decision. Defendant has given partial answers to these interrogatories, claiming that the materials submitted *in camera* are subject to "self-critical analysis privilege." Plaintiffs claim that these documents are necessary for establishing the above elements of their case, as they seek both compensatory and exemplary damages.

### II. *Discussion*

Fisher–Price seeks to shield the majority of the documents submitted for review on the ground that self-critical analysis privilege protects them from discovery. Jurisdiction of this matter is based on diversity, 28 U.S.C. § 1332(a)(1); thus, this Court applies state law in determining whether a privilege for self-critical analysis exists, and if so, whether the documents in question are protected by the privilege. *See Erie R. Co. v. Tompkins,*

304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Fed.R.Evid. 501. The issue is apparently one of first impression in Vermont, and this Court must therefore predict whether the Vermont Supreme Court would recognize such a privilege under the circumstances presented here.

█ In general, discovery must be complied with where the information sought may lead to admissible evidence. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). Parties may obtain discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action." Fed.R.Civ.P. 26(b)(1). Pursuant to Federal Rule of Civil Procedure 26(a), parties must disclose specified information before trial unless a stipulation, order or a local rule provides otherwise. Privileged documents or those otherwise protected from disclosure are safeguarded from the discovery process. Fed.R.Civ.P. 26(b)(1). Under Vermont law, "[t]he party seeking to invoke the privilege bears the burden of justifying its application." *Douglas v. Windham Superior Court*, 157 Vt. 34, 44, 597 A.2d 774 (Vt.1991) (citations omitted).

Although the present case addresses materials held in Fisher–Price files, it is useful to consider the CPSC's decision to withhold the same material in its files from public disclosure. Section 6(b) of the Consumer Product Safety Act ("CPSA"), 15 U.S.C. § 2055(b), restricts the CPSC from disclosing information about potential safety problems that manufacturers of consumer products must provide to the CPSC under section 15(b) of the CPSA, 15 U.S.C. § 2064(b). Congress gave the CPSC broad powers to gather, analyze and disseminate information, at the same time adopting "safeguards specifically 'designed to protect manufacturers' reputations from damage arising from improper disclosure of that information." *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 111–12, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). The safeguards provide protection for trade secrets or other sensitive cost and competitive information, and also attempt to ensure the accuracy of the information disclosed. 15 U.S.C. § 2055(a), (b).

In enacting the CPSA, Congress struck a "balance between the interests of consumers and the need for fairness and accuracy with respect to information" obtained from manufacturers. *Id.* at 123–24, 100 S.Ct. 2051. Pursuant to the dictates of these statutes, the CPSC has protected certain information in its investigatory file on Fisher–Price from public disclosure.

It is important to note, however, that this statutory protection neither governs disclosure by a private party nor limits the power of a court to restrict or order discovery. Since the motion before this Court concerns ordering discovery of materials held by a private party, the language of the CPSA does not resolve the issue in this case. Given the lack of congressional guidance in this area, it is helpful to examine the federal common law application of self-critical analysis privilege before turning to state law.

A federal court first granted protection from discovery for self-critical analysis in *Bredice v. Doctors Hosp., Inc.*, 50 F.R.D. 249, 250 (D.D.C.1970), *aff'd*, 479 F.2d 920 (D.C.Cir.1973). In that medical malpractice case, the *Bredice* court refused to allow discovery of records of meetings of the medical staff to review, analyze, and evaluate the clinical work of its members, convened with the understanding that all communication taking place within the meeting would be confidential. The *Bredice* court stressed that the purpose of such staff meetings was to improve the overall quality of patient care, and to educate doctors and medical students: "[c]onstructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit." *Id.* Several courts subsequently rejected this analysis. *See, e.g., Sweasy v. King's Daughters Memorial Hosp.*, 771 S.W.2d 812 (Ky.1989); *West v. Marion Laboratories, Inc.*, 1991 WL 517230 (W.D.Mo.1991); *LeMasters v. Christ Hosp.*, 791 F.Supp. 188 (S.D.Ohio 1991).

Thus, it is not the case that all self-critical discussion initiated in a strictly confidential context receives this privilege. In *University of Pennsylvania v. EEOC*, 493 U.S. 182, 195, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990), the

United States Supreme Court unanimously declined to recognize a qualified common-law privilege against disclosure of confidential academic peer review materials as without historic or statutory basis. In that case, the EEOC, investigating a claim of racial and gender discrimination in the university's denial of tenure to an associate professor, issued a subpoena for the tenure-review files of the professor and several colleagues. The university sought protection for what it termed "confidential peer review information" in the files. The Court noted that when Congress extended Title VII to educational institutions and provided for broad subpoena powers, it did not see fit to create such a privilege. *Id.* at 189, 110 S.Ct. 577. Acknowledging the importance of confidentiality to the academic peer review process, it nevertheless deemed that ferreting out racial and gender discrimination was of greater importance. *Id.* at 193, 110 S.Ct. 577.

■ While there appears to be a limited recognition in the federal courts of the self-critical analysis, it is rarely found to apply, and is circumscribed in several ways. In those circumstances where information is protected by the privilege, a showing of extraordinary circumstances or special need has been found to trump the privilege. *See, e.g., Mao–Shiung Wei v. Bodner,* 127 F.R.D. 91 (D.N.J.1989); *Bredice v. Doctor's Hospital, Inc.,* 50 F.R.D. 249 (D.D.C.1970), *aff'd without opin.,* 479 F.2d 920 (1973). Several other limitations on its application have been announced by the federal judiciary. *See, e.g. Dowling v. American Hawaii Cruises, Inc.,* 971 F.2d 423, 426 (9th Cir.1992) ("We believe the district court struck the wrong balance, and we hold that no privilege of 'self-critical analysis' protects routine internal corporate reviews of matters related to safety concerns."). The privilege is uniformly limited to protection of subjective or conclusory materials. Recitations of factual details are not protected by the privilege. *See e.g., Webb v. Westinghouse Elec. Corp.,* 81 F.R.D. 431, 434 (E.D.Pa.1978); *Troupin v. Metropolitan Life Ins. Co.,* 169 F.R.D. 546, 550 (S.D.N.Y.1996).

Some courts have categorically refused to apply the privilege. *See, e.g., Franzon v. Massena Memorial Hospital,* 189 F.R.D. 220 (N.D.N.Y.) ("[T]here are no Supreme Court or Second Circuit cases recognizing such a privilege. [...] T]he viability of such a privilege is in serious doubt. [...] Most courts in this Circuit have questioned the continuing validity of the self-critical analysis privilege.") (citations omitted); *In re July 5, 1999, Explosion at Kaiser Aluminum & Chemical Company,* 1999 WL 717513, *2 (E.D.La.1999) (slip copy) ("Kaiser's assertion of the self-critical analysis (also known as self-evaluative) privilege is likewise rejected. Such a privilege is largely undefined and courts have been reluctant to recognize or enforce the same.") (citations omitted); *Federal Trade Commission v. TRW, Inc.,* 628 F.2d 207, 210 (D.C.App.1980) ("As the court stated in *Lloyd v. Cessna Aircraft Co.,* 74 F.R.D. 518, 522 (E.D.Tenn.1977), the privilege 'at the most remains largely undefined and has not generally been recognized.'").

If a limited privilege of self-critical analysis exists, then this Court must determine whether it applies in situations like the present one, where the government has mandated certain disclosures of Fisher–Price. In *Paladino v. Woodloch Pines, Inc.,* 188 F.R.D. 224 (M.D.Pa.1999), the court found the privilege to not apply to a report prepared by the resort's director of safety services, even though the report contained an analysis of what staff could have done to prevent the incident and prevention techniques to be implemented. The court reasoned that the self-critical analysis privilege was singularly useful in maintaining voluntary compliance with governmental regulation. In *Dowling v. American Hawaii Cruises,* 971 F.2d 423, (9th Cir.1992), the Ninth Circuit similarly concluded that businesses had their own strong incentives for voluntary assessments of their products or safety procedures, and would not be "chilled" from these self-critical activities if the products of these assessments were subject to disclosure. Absent governmental mandate, the privilege was found to be unnecessary. In *Resnick v. American Dental Association,* 95 F.R.D. 372, 374–75 (N.D.Ill.1982), the court held that in order to receive the privilege, the materials had to be, *inter alia,* generated in compliance with governmental investigations. A handful of courts cite the following test in determining

whether the privilege exists: "(1) the materials must have been prepared for mandatory government reports; (2) the privilege extends only to subjective evaluative materials; (3) the privilege does not extend to objective data in any such reports; and (4) discovery should be denied only where the public policy favoring exclusion clearly outweighs the plaintiff's need." *See, e.g. Kern v. University of Notre Dame Du Lac,* 1997 WL 816518, *8 (N.D.Ind.). However, in *Morgan v. Union Pacific Railroad Company,* 182 F.R.D. 261 (N.D.Ill.1998), the court found that in tort cases, the self-critical analysis privilege does not require the party asserting the privilege to have responded to a governmental mandate. Finally, in *In re Air Crash Near Cali, Colombia,* 959 F.Supp. 1529 (S.D.Fla. 1997), the court appears to have come to the opposite conclusion. In that case, a plane crash compelled the company to conduct a rigorous self-critical examination with an eye to sharing that information with a governmental agency. "[T]hese materials were prepared for dissemination to representatives of entities unaffiliated with American (a federal regulatory agency and a union)." *Id.* at 1533. The court reasoned that since the information was generated with the expectation that at least one party outside the company would be privy to it, the privilege did not apply.

In turning to state law, the self-critical analysis privilege is recognized in Vermont for medical peer review material, pursuant to statute. The proceedings, reports and records of peer review committees which evaluate the quality of care rendered by health services providers are immune from discovery. Vt.Stat.Ann. tit. 26, § 1443 (1998). The language of the statute is limited to "any civil action against a provider of professional health services." *Id.* The self-critical analysis privilege has not been successfully invoked outside the medical arena, although the Vermont Supreme Court has recognized a somewhat similar investigatory files privilege for information contained in official government files. *Douglas v. Windham Superior Court,* 157 Vt. 34, 40, 597 A.2d 774, 778 (1991). The fact that the documents in this case were generated and retained in a joint government-corporate evaluation does not

trigger *Douglas,* since the documents themselves were retained by, and are being requested from, Fisher–Price rather than from the government.

The absence of an existing federal or state self-critical analysis privilege for joint government-corporate evaluations does not necessarily foreclose defendant's arguments in this case. In addition to recognizing rules of privilege which have been created by the federal and state constitutions, statutes, and the Vermont Rules of Evidence, Vermont courts possess the power to develop new rules of privilege derived from common law principles. V.R.E. 501. As the Vermont Supreme Court has stressed, however, " 'exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.' Because of their interference with truthseeking, privileges are strongly disfavored." 157 Vt. 34 at 39–40, 597 A.2d 774 (quoting *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)).

The Vermont Supreme Court has relied on the four-part test for recognition of a privilege set forth in Dean Wigmore's treatise:

(1) The communications must originate in a confidence that they will not be disclosed.

(2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.

(3) The relation must be one which in the opinion of the community ought to be sedulously fostered.

(4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.

157 Vt. at 40, 597 A.2d at 777–78 (quoting 8 Wigmore on Evidence § 2285, at 527 (McNaughton ed.1961)). "The party seeking creation of the privilege has the burden of satisfying the four Wigmore conditions, [ . . . ] and must satisfy all four conditions before the privilege will be recognized." *In re Inquest Proceedings,* 165 Vt. 549, 551, 676 A.2d 790 (Vt.1996) (citations omitted).

In addressing the first prong of the Wigmore test, the communication did originate in a confidential situation. The CPSA's rules about restricting disclosure assure the investigated party that produced materials will not be lightly disclosed. However, such confidentiality does not appear to be "essential to the full and satisfactory maintenance of the relation between the parties" as required by the second prong of the Wigmore test. In particular, as the Amicus Brief submitted by the U.S. Attorney's office conveys, the CPSC's ability to receive accurate reporting of information will not be undercut by subsequent disclosure of some of that material in litigation. The reporting of certain information about potential product defects to the CPSC is mandated by law; thus, a company's refusal to compile and disclose materials to CPSC out of fear of subsequent public disclosure would simply be illegal. Therefore, the present issue fails the second part of the Wigmore test.

The materials under review also fail the last two prongs of the test. While it appears important to sedulously foster the relationship between corporations and the CPSC, the mandatory nature of reporting to the CPSC by corporations mitigates the need to develop a strong relationship between the two parties.

Finally, this Court must determine whether "the injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation." In the present case, the disclosure of such information would not undermine the Commission's ability to ascertain the information they require. The U.S. Attorney's Amicus Brief concluded that "[b]ecause section 15(b) requires manufacturers to provide certain information to the Commission, the Court's decision on this privilege question is unlikely either to hinder or aid the Commission." Here, the value of maintaining the free flow of information in discovery clearly supercedes the likelihood of thwarting the Commission's ability to obtain information necessary for the protection of consumers. Thus, the materials submitted *in camera* fail the

Wigmore test utilized by the Vermont Supreme Court in recognizing new privileges.

■ This Court predicts that the Vermont Supreme Court would not adopt a self-critical analysis privilege given the facts of this case. The present statutory form of self-critical analysis privilege in Vermont applies only to medical review situations, and does not protect documents generated and retained by businesses in compliance with government. Furthermore, application of the Wigmore test to the facts in this case establishes that a new self-critical analysis privilege for documents generated and retained by businesses in compliance with government mandates would not have been created by the Vermont Supreme Court. Thus, no form of self-critical analysis privilege protects the documents submitted *in camera*.

Finally, even if self-critical analysis privilege had been adopted in this case, it would have exclusively protected subjective or conclusory materials. The majority of the documents fail to meet this requirement; only documents 11, 32, and 108 would have been covered by the privilege had it applied. However, since attorney-client privilege does apply to documents 2–7, 22–26, 27–30, and 31, those materials are shielded from discovery.

## III. *Order*

Plaintiff's Motion to Compel (paper 9) is GRANTED in part, and Defendant's Motion for Protective Order (paper 15) is GRANTED in part. The Court finds all of the documents submitted are not protected from disclosure by the self-critical analysis privilege. However, documents numbered 2–7, 22–26, 27–30 and 31 are protected by attorney client privilege and should not be disclosed.